[Civ. No. 12282. Third Dist. Mar. 10, 1971.]

KATHLEEN CHABOT, a Minor, etc., et al., Plaintiffs and Respondents, v. JOHN ERNEST MEREDITH, Defendant and Appellant.

**COUNSEL**

Peters, Fuller & Byrne, David R. Fuller and Richard G. Logan for Defendant and Appellant.

Charles E. Hurley, Newton & Newton, and Albert Newton, Jr., for Plaintiffs and Respondents.

## OPINION

**REGAN, J.**—Defendant appeals from the judgment entered after a general jury verdict for plaintiffs, Kathleen Chabot and her mother, Mary Ann Chabot Hillmon.[1]

Defendant, 18 years of age, while a visitor at plaintiffs' residence in Los Angeles County, volunteered to drive plaintiff Kathleen, age 15 years, to the local bus depot so she could take a bus to Medford, Oregon. Kathleen's mother gave her consent and defendant drove Kathleen, her brother Roland and two friends to the depot where Kathleen purchased a bus ticket for the trip from $25 supplied by the mother. While at the bus station, defendant offered to drive Kathleen to Oregon. It was generally agreed that Kathleen would feel better mentally if defendant, Dave Staples and Kathleen's brother drove her to Oregon. Kathleen thought this arrangement was "all right."

Defendant offered to make this trip because Kathleen and her brother, Roland, were friends of his and that by doing this it might make her feel better. Defendant denied receiving any money to take her to Oregon, and stated he received no tangible benefit for the trip.

The bus ticket was cashed and the proceeds were pooled with monies the other had. Dave Staples and Roland Chabot had about $5 between them, but defendant had no money. The pooled money was to be used for gas and food on the trip.

The group went back to the Chabot household to talk to Kathleen's mother before they left, but she was not at home. Roland left his mother a note explaining that they were going to drive Kathleen to Oregon. (The mother testified that she would not have given permission for this trip if she had been consulted.) Kathleen didn't think her mother would be upset over the fact that she hadn't caught the bus.

Defendant's automobile, a four-passenger Austin Healey with a fiberglass top, had been purchased for defendant about 36 hours prior to the accident, and he had driven it twice in the Los Angeles area prior to the trip to Medford.

Defendant's plan was to leave Los Angeles on Saturday night and to drive nonstop to Medford, and then return to Los Angeles on Monday. They started the trip about 10 p.m. Saturday night. The three boys took turns driving. Defendant slept some while the others drove. Several stops

---

[1]Plaintiff's mother sought and received reimbursement for medical expenses incurred on behalf of her daughter. The primary plaintiff, however, is Kathleen, the minor child who suffered physical injuries.

were made either to buy gas or obtain something to eat. They arrived in Yreka, California, about two o'clock Sunday afternoon.

After stopping in Yreka, defendant took over the driving. It was a warm, bright afternoon and the traffic was normal. Defendant had never driven the road—a state highway—before. The road is what is commonly referred to as a "mountain road," with a mountain on one side and a steep drop-off on the other. According to the testimony of the investigating officer, this road is one of the worst stretches of interstate highway in California "because of the fact that it's so many sharp curves and narrow road and blind curves on it." The curve on which the accident occurred is probably the worst curve north of Yreka before the Shasta River bridge. There are more accidents on this curve than on others, and the guardrail at this point had been wiped out by truck accidents and a new guardrail had to be installed.

About 400 feet south of the accident scene there was a sweeping-curve warning sign, although in fact the curve, considering the whole roadway, was almost a complete "U." There was no speed indicator on the sign. Defendant could recall no warning sign at this curve on which the accident happened.

Defendant had had no problems with previous curves and stated that he was driving about 60 miles per hour on the straight stretches and was slowing down for the curves. He denied having heard plaintiff tell him to slow down.

Defendant testified that as he approached the accident turn, an oncoming car was a little bit on his side which "startled me and I jarred the wheel to the right" to avoid a collision. The car went off to the right and struck the guardrail. Defendant turned to the left as hard as he could, went across the road despite braking, and hit the mountain on the other side, the car turning over. From the place where the car originally left the paved road, on the right-hand side, until it returned again to the roadway, there were tire marks measuring 120 feet. After returning to the paved surface, the car laid down tire marks measuring 85 feet; the marks indicated the vehicle was in a broadside skid.

The accident occurred approximately seven miles north of Yreka at about 2:30 p.m. There were no independent eyewitnesses to the crash. In the opinion of the investigating officer, the accident was caused by the vehicle traveling too fast for the condition of the roadway. Defendant admitted talking to police officers after the accident, but could not recall what had been said. The investigating officer testified that after the accident defendant "guessed" that the accident was caused by his excessive speed. Defendant

made no mention of any vehicle crowding him off the road. The officer felt that defendant was rational enough to give a statement.

According to the deposition of David Staples, which was read into evidence, from Yreka to the scene of the accident the car was being driven a little above the speed limit. He knew they weren't going at a safe speed. According to Staples, they were going into the turns rather fast. He estimated the car's speed at about 45 to 50 miles per hour. When the car got into the curve, Staples knew they were going too fast.

Roland Chabot, Kathleen's brother, testified that from Yreka northbound defendant was not skidding the car around the road, and he made no protest about how the car was being driven. Roland stated that "the speed for the whole trip didn't vary much. We stayed roughly around sixty-five, seventy, sometimes seventy-five, depending on the condition of the road." Roland estimated defendant's speed, upon entering the curve, at between 65 and 70 miles per hour. He saw no car or truck on their side of the road prior to the accident.

Kathleen testified that just before the accident defendant rounded another curve "pretty fast" and "I got pretty scared." She did not recall seeing any vehicle on their side of the roadway. As the group proceeded north out of Yreka, Kathleen told defendant to slow down because he was going too fast, but she could not remember the number of times she told him this.

Roland remembered that Kathleen told defendant to slow down at least once prior to approaching the accident curve. Staples also heard her tell defendant to slow down.

As a result of the accident, Kathleen suffered severe injuries.

Defendant contends that Kathleen was a guest within the meaning of the guest statute[2] as a matter of law. He presents a two-pronged argument.

Defendant first contends that Kathleen was capable of accepting and did accept the ride as a guest of defendant without parental consent. Defendant argues that the correct rule is that the rider who is of sufficient age and intelligence to know what he is doing in accepting a ride in an automobile should be deemed a guest within the terms of the statute. (See *De Falla* v. *Tuttle* (1955) 132 Cal.App.2d 473 [282 P.2d 513].)

[2]Vehicle Code section 17158. In *Morrison* v. *Townley* (1969) 269 Cal.App.2d 863, 867 [75 Cal.Rptr. 274], we commented as follows: "The 'guest law' takes away the right of action for injuries or death to a guest in a motor vehicle resulting from negligence of the driver, and permits recovery only where there is intoxication or willful misconduct. The primary policy underlying this statute is to prevent recovery for ordinary negligence by a guest *who has accepted the hospitality* of the owner. A secondary policy is to prevent collusive suits between friends where the driver admits negligence in order to shift the burden to his insurance carrier. [Citation.]" (Italics added.)

In *De Falla,* a 10-year-old girl injured in an automobile accident was held to be a guest. The evidence showed, however, that the girl was a member of a group of Camp Fire Girls, that her mother gave consent to her attending a series of concerts, signed a written permit to go by school bus and made no objection when she learned her daughter traveled by private car to concerts and was in such other mode of transportation when the accident occurred. *De Falla* contains the factors of group activity and implied consent.

Here the minor plaintiff maintains, on the other hand, that whether she accepted the ride was a question of fact, not law,[3] that the law is clear the custody of a minor child is in the parents, and that under the facts of this case the evidence precludes a holding, as a matter of law, that the offered ride was "accepted."

Kathleen notes that specific permission was requested of her mother prior to the trip to the bus terminal; that after deciding on the trip to Oregon, Kathleen and defendant returned to the Chabot residence, which leads to the inference that the ultimate decision was up to her mother, and that her mother testified at trial that she would not have consented if she had been consulted.

Thus, she concludes the trial court properly refused to hold that she was a guest as a matter of law. Kathleen goes even further, however. She submits that the true rule is that when the plaintiff is an unemancipated minor living under direct parental custody and control, the "acceptance" as a "guest" must be through the act of his parent. (Cf. *Buckner* v. *Vetterick* (1954) 124 Cal.App.2d 417, 419 [269 P.2d 67]; *Rocha* v. *Hulen* (1935) 6 Cal.App.2d 245 [44 P.2d 478].)

No California case has been cited, and we have found none, which is precisely in point. We hold only that once the issue of acceptance of the ride was raised, it was properly submitted to the jury as a question of fact and there was no error in so doing.

■ Defendant also contends that the mere sharing of the expenses of the automobile trip did not cause Kathleen to become a passenger rather than a guest. This contention has been adequately answered by recent appellate decisions of this state. In *Nevarez* v. *Carrasco* (1969) 1 Cal.3d 518, 522 [82 Cal.Rptr. 721, 462 P.2d 577], the court states: "If the rider has

---

[3] Plaintiff places great stress on the word "accepts" as used in the statute (Veh. Code, § 17158), for only a guest who "accepts" a ride is denied a recovery on the basis of ordinary negligence. Usually this element is clearly established. Here, however, plaintiff raised the issue and the trial court ultimately submitted the issue of acceptance to the jury as a question of *fact.*

contributed to the expenses of a trip and his contributions are a motivating influence for the driver's furnishing the transportation, it cannot be said that the rider is accepting the 'hospitality' of the driver. Of course, whenever one drives another without compulsion, there may be a significant element of hospitality in his conduct; but if that were enough to involve the policy of the statute, the payment of compensation for the ride could generally be deemed irrelevant. A rider does not accept the hospitality of the driver when the rider 'pays his own way' and the driver furnishes the transportation because of this circumstance. It is the element of compensation and not the purpose of the trip which is the relevant criterion in ascertaining whether the rider is merely accepting the hospitality of the driver."

In *Joslyn v. Callison* (1970) 12 Cal.App.3d 788, 794 [90 Cal.Rptr. 884], the court comments: "While there was no direct evidence reflecting an agreement between the three boys to share expenses, both riders gave the defendant money. The mandate of *Nevarez, supra,* seems clear: Once it is established that compensation flows from the rider to the driver—a sharing of expenses—the rider's status presents a jury question."

Here there was evidence that Kathleen contributed $25 to the "pool" for the trip. Two other boys contributed $5 between them. Defendant had no money. We think it was a proper jury question as to whether her contribution was a motivating influence for the driver's furnishing the transportation. (*Nevarez v. Carrasco, supra,* 1 Cal.3d 518; *Joslyn v. Callison, supra,* 12 Cal.App.3d 788; *Hart v. Wielt* (1970) 4 Cal.App.3d 224, 235 [84 Cal. Rptr. 220]; see *Bozanich v. Kenney* (1970) 3 Cal.3d 567 [91 Cal.Rptr. 286, 477 P.2d 142]; *Morrison v. Townley* (1969) 269 Cal.App.2d 863, 871 [75 Cal.Rptr. 274].)

■ Defendant contends the instruction that Kathleen could not be a guest without parental consent is erroneous and ambiguous and constitutes reversible error.

Contrary to defendant's contention, this is not the instruction the court gave. The court instructed that in determining whether or not plaintiff "accepted" a ride, all the factors and circumstances must be considered. As we have previously discussed, we think "acceptance" was properly in issue and therefore an instruction was called for. We find no ambiguity in the instruction, and under the facts in this case there was no error in giving such instruction.

■ Lastly, defendant contends that there was no substantial evidence that the defendant was guilty of willful misconduct.

In *Morrison* v. *Townley, supra,* 269 Cal.App.2d at pages 867-871, we reviewed the law relating to willful misconduct under the guest statute. As we noted there, the issue is primarily one of fact for determination by the trier thereof. We think the evidence here was not insufficient as a matter of law to show willful misconduct. Without detailing all of the evidence, the record shows the following: Defendant had come into possession of a new sports car only 36 hours prior to the Oregon trip; defendant had not been to bed (as distinguished from sleeping in the car) for some 28 hours; defendant was not familiar with the road; there was evidence of speeding; plaintiff's warning; and, the expert opinion of the traffic officer.

We find no error in submitting the issue to the jury. (See *Hart* v. *Wielt, supra,* 4 Cal.App.3d at p. 235; *Morrison* v. *Townley, supra,* 269 Cal.App.2d at p. 871.) In *Morrison, supra,* this court stated (at pp. 867-868): "As stated in *Williams* (at p. 584): '[W]illful misconduct implies the intentional doing of something either with knowledge, express or implied, that serious injury is a probable, as distinguished from a possible, result, or the intentional doing of an act with a wanton and reckless disregard of its consequences.'

"Two recent appellate court decisions further analyze the concept. In *Pelletti* v. *Mebrila* (1965) 234 Cal.App.2d 606, 611 [44 Cal.Rptr. 588], the court states: '[W]hen conduct falls sufficiently below the acceptable norm to become grossly deficient, we characterize it as imbued with a bad intent which we call willful misconduct. We attribute a malicious state of mind to the actor irrespective of any actual specific intent.' In *Chappell* v. *Palmer* (1965) 236 Cal.App.2d 34, 37 [45 Cal.Rptr. 686], the court concludes that a pragmatic test has evolved: '. . . whether a reasonable man under the same or similar circumstances as those faced by the actor would be aware of the dangerous character of his conduct.'

"The existence of willful misconduct is essentially a question of fact, and the driver's entire course of conduct is to be considered. [Citation.] The element of intent is usually inferred from objective or external circumstantial evidence. [Citation.] 'Since the driver will rarely, if ever, admit to having driven with the frame of mind which would render his behavior culpable under the guest statute, the intentional, wanton character of his behavior may be implied from the surrounding circumstances.' [Citation.] If there is any substantial evidence to support the jury's finding, an appellate court will not overturn the verdict. [Citation.] And the guest statute must be

strictly construed, since it lessens the common law right of redress for injuries inflicted. [Citation.]"

The judgment is affirmed.

Janes, J., concurred.

**FRIEDMAN, Acting P. J.**—I concur with the result. Plaintiffs' counsel had an opportunity to request special verdicts on the issues of Kathleen's guest status and defendant's willful misconduct. (Code Civ. Proc., § 625.) Counsel did not do so. The general verdict implies findings in favor of the prevailing party on all issues submitted to the jury. (*Rawlings* v. *Harris* (1968) 265 Cal.App.2d 452, 454 [71 Cal.Rptr. 288]; *Christensen* v. *Malkin* (1965) 236 Cal.App.2d 114, 123 [45 Cal.Rptr. 836].) The same notion, in altered form, is expressed by the rule refusing appellate review of a general verdict when several issues are tried and one of them is supported by substantial evidence and is unaffected by error. (*Lysick* v. *Walcom* (1968) 258 Cal. App.2d 136, 157 [65 Cal.Rptr. 406, 28 A.L.R.3d 368]; *Posz* v. *Burchell* (1962) 209 Cal.App.2d 324, 335-337 [25 Cal.Rptr. 896].) When there is a guest-passenger issue and an implied finding of passenger status, the reviewing court does not reach the issue of willful misconduct. (*Tucker* v. *Landucci* (1962) 57 Cal.2d 762, 766-767 [22 Cal.Rptr. 10, 371 P.2d 754]; *Gillespie* v. *Rawlings* (1957) 49 Cal.2d 359, 369 [317 P.2d 601].)

Appellate courts are wrestling with overwhelming caseloads. Well-conceived special verdicts simplify and often eliminate issues on appeal. (See, e.g., *Raymond* v. *Paradise Unified School Dist.* (1963) 218 Cal.App.2d 1 [31 Cal.Rptr. 847].) We should not permit the tactical choices of trial counsel to force abstract issues upon us. Rather, we should utilize opportunities to force counsel into requesting special verdicts. There is no problem in locating responsibility for the request. The responsibility rests with the party who will lose the verdict. Under the circumstances of the case, I do not reach the willful misconduct issue.

Appellant's petition for a hearing by the Supreme Court was denied May 6, 1971.