[Civ. No. 12329. Third Dist. Oct. 29, 1971.]

MAUREEN McCLOUD, Plaintiff and Appellant, v.
ROY RIEGELS CHEMICALS et al., Defendants and Respondents.

## COUNSEL

Rawles, Golden & Hinkle and John J. Golden for Plaintiffs and Appellants.

Hardy, Erich & Brown for Defendants and Respondents.

## OPINION

**PIERCE, J.**\*—The appeal is by plaintiff Maureen McCloud† from a judgment following a defense verdict in a personal injury action. There are two assignments of error: (1) that the trial court instructed the jury inadequately regarding the manner in which separate property may be transmuted to community property; and (2) that the court improperly denied plaintiff a new trial. The judgment will be affirmed.

### The Facts

On the morning of June 5, 1967, plaintiff and her husband were eastbound in a small British-made automobile on State Highway 16, a two-lane highway. Plaintiff's husband was driving and she was seated beside him. Rain had started shortly before and the pavement was wet.

A truck belonging to defendant Riegels, driven by defendant Pugh in the

---

\*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

†Her husband, Louis Scott McCloud, originally a plaintiff was dismissed as a party plaintiff by stipulation before trial.

course of his employment, with another employee, Joe Lavario, riding with him, had been traveling in the westbound lane of the same highway.

As Pugh approached the intersection of Highway 16 and the off-ramp leading into Highway 505, he intended to make a lefthand turn onto the latter. Highway 16 crosses Highway 505 on an overpass. The main bridge crossing the freeway (505) is located 700 feet west of the crest of the south turn off-ramp which descends on an arc and joins Highway 505 to the west at ground level. Approximately a quarter of a mile back from the entrance to the off-ramp Pugh had flashed his left-turn indicator, then started to make his left turn. During this maneuver he observed the plaintiff vehicle to the west. When first observed that car was on the overpass bridge which, as indicated, was 700 feet west. Pugh's testimony (by deposition) was that no portion of his truck had entered the eastbound lane. As he watched plaintiff's car he saw it moving into what appeared to be a locked wheel skid. Pugh immediately pulled the truck over to the right edge of the westbound lane and stopped. Plaintiff's car continued to skid. It collided with defendants' truck and came to rest partly under the rear portion. The testimony of Lavario, a defense witness, corroborated that of Pugh. Lavario stated, however, that at one point, while the truck was proceeding along the way towards making its intended turn, it had gotten three feet over the center line but had returned before the accident to the position on the right edge of the road.

Both plaintiff and her husband testified. Each related essentially the same account of the accident. Scott stated he was approximately 200 to 250 yards from the intersection when he first observed defendants' truck entering his lane making a left turn. Scott placed his speed at 55 miles per hour. He said he did not believe he could, traveling at that speed, stop his car in time to avoid a collision with the Riegels truck. He decided instead to leave the eastbound lane and cross over to the westbound lane, intending to go around the truck.

When Scott applied his brakes his car started "fish-tailing" and he lost control. The vehicle slid back and forth across the road. It struck the rear of defendants' now stationary truck and came to rest partially underneath it. Maureen suffered back injuries.

Maureen and Scott had been recently married. At the time of her marriage Maureen had owned the automobile, although for insurance purposes it had been registered in her mother's name. Maureen testified that after the marriage she and Scott had an understanding that the car

belonged to both of them as their community property. We append her testimony in the margin.[1] Scott's testimony did not cover that subject.

Defendants pleaded contributory negligence. A general verdict was returned.

### Failure to Instruct re Transmutation
### of Separate to Community
### Property

■ It is conceded by plaintiff that Scott was guilty of negligence and that his negligence proximately contributed to the accident. That concession by plaintiff's counsel is understatement. Scott's manner of driving, by his own testimony, was so bizarre as to be almost unbelievable. We quote this testimony: "Q. I believe you also told us, Mr. McCloud, that when that truck started to turn you were some 200 to 250 yards back away from the truck. Is that true? A. Approximately, yes sir. Q. Still traveling 55 miles per hour? A. Before I started turning? Q. When you started your turn. A. When I started, yes sir. Q. We are talking about yards, are we? A. Yes sir. . . . Q. Is it your testimony you couldn't stop your vehicle going 55 miles per hour in a distance of 200 to 250 yards? A. In my estimation, as I was proceeding down the ramp, no sir, I couldn't."

We can judicially notice that the available stopping distance was more than twice that required. At this point Scott McCloud was *more than two blocks away*. Instead of yielding the right of way to the truck which he saw had already commenced its turn he continued on. Defendant Pugh therefore aborted his turn, swung to the extreme right of the highway and came to a stop. It is difficult for this court to understand on any fair appraisal of the testimony in what respect Pugh deviated from the role of a reasonable driver. The trial court may have been viewing the case more than somewhat conservatively in not resolving the issue of defendant's negligence in the latter's favor *as a matter of law*. We need not decide that question. Assuming that the issue of defendant Pugh's negligence was a fact question, the court correctly and effectively instructed the jury that it was to find in favor of defendants if it found: (1) Maureen to be the owner of the car; (2) that Scott was driving it with her permission; and (3) that

---

[1]Maureen testified: "A. . . . [The car involved] was just considered ours after we were married. Q. By 'ours', who do you mean? A. Well, if he had had a car, it would be our car. I just happened to have the car, so it was our car. Q. How did you, yourself, prior to this collision in June, 1967, look at the question of who owned the car? A. I never really looked at it. Never thought about it. Took it for granted. Q. Took what for granted? A. That is was our car. Q. By that, what do you mean? A. Well, community property. Q. Did Scott ever ask your permission to drive the car? A. Never." (We will note variances from this story below.)

Scott was contributorily negligent.[2] At plaintiff's request the jury was further instructed that any contributory fault on the part of Scott would not preclude recovery by Maureen if it found the car to be the community property of the plaintiff and her husband. (See *Hooper* v. *Romero* (1968) 262 Cal.App.2d 574, 580-581 [68 Cal.Rptr. 749].) No instructions, however, were given to assist the jury to determine whether the vehicle was separate property or community property (see fn. 1), or how the transmutation of separate property into community could occur.

In *Haseltine* v. *Haseltine* (1962) 203 Cal.App.2d 48 [21 Cal.Rptr. 238] (hg. den.), the court states at pages 58-59: "The law is clear that a husband and wife may by agreement transmute their separate property into community property. [Citations.] It may be done by oral agreement [citations], no particular formalities being necessary [citations]. Where the parties agree that property shall be considered community property that is sufficient to so create it. [Citation.] 'All that is required to show an executed oral agreement of transmutation is proof of the parties acts and conduct in dealing with their property.' [Citations.] Whether from such conduct and acts a transmutation has been effected is a question for the trier of fact. [Citation.]"

If there actually was substantial evidence in the record, under the rules stated, that the automobile had been converted from the wife's separate property into community property—and the testimony of the wife (see fn. 1) is at least some evidence on the subject—then we may assume the trial court would have been obligated to instruct the jury so that it would not be left in the dark, unable to make a judgment on the question.[3] In the case before this court the trial court had offered to give enlightenment by an appropriate instruction on the issue of the separate-to-community property transmutation.

---

[2]Vehicle Code section 17150 as in effect prior to July 1967 imputed the negligence of a driver "to the owner for all purposes of civil damages." The section was amended to delete that provision in 1967 (Stats. 1967, ch. 702, p. 2072). By its express terms (in § 14) the amendment was not retroactive. The accident here involved, however, occurred prior to the effective date of the amended act.

[3]"Ordinarily," it has been said, "in the absence of a specific request by a party, the judge has no duty to instruct. . . . However, it is the duty of the court to see that jurors are guided on controlling legal principles, and the complete failure to instruct properly on a basic issue may be reversible error." (4 Witkin, Cal. Procedure (2d ed. 1970) Trial, § 195, pp. 3014-3015, citing *Thomas* v. *Buttress & McClellan, Inc.* (1956) 141 Cal.App.2d 812, 819 [297 P.2d 768]; see generally *id.* pp. 3012-3014; see also *Distefano* v. *Hall* (1963) 218 Cal.App.2d 657, 672-673 [32 Cal.Rptr. 770].) A judge is more than a referee. But that does not mean that a judge is obligated to overrule a party's attorney, giving an instruction which the attorney obviously does not want.

In a discussion between court and counsel on the subject of instructions, plaintiff's counsel stated that he felt it to be the responsibility of the defense to offer an instruction on transmutation. He (plaintiff's counsel) felt he would possibly be guilty of inviting error if he submitted such instruction. After this statement was made, the trial court specifically asked all counsel if instructions on transmutation should be given. No request was so made and the subject was dropped.[4]

Of course, it was NOT the burden of counsel for defendants to offer instructions on the subject of transmutation of separate into community property. The discussion we have quoted in the margin actually involved a tactical decision by plaintiff's counsel to forego instruction on the subject. There were two possible reasons for his decision. First, there appears in the record material contradiction by Maureen of her own testimony on the subject. We have quoted the testimony (fn. 1). But she had also given her deposition, portions of which are in the record.

In that deposition she had said: "Q. And you were riding as a passenger in *your own* automobile? A. Yes. Q. Why weren't you driving that automobile? A. I usually *let* my husband drive, trips. . . . [After discourse regarding her attempts to cause her husband to drive slowly.] Q. Kind of

---

[4]The following colloquy betwen court and counsel occurred: "GOLDEN: [Plaintiff's attorney] Our contention [is] that the evidence would support a finding that the property was community property and for that reason, was under the management and control of Scott McCloud who had legal right to drive the car without seeking the permission of his co-owner wife. COURT: You have submitted no instructions to that effect. GOLDEN: No, because I felt the issue of imputed contributory negligence is—has been pleaded by the Defendant, and the burden is carried on the Defendant, and I don't think—I think if the plaintiff submitted instructions on that question, it would be tantamount to a concession there is evidence to support the defense of imputed contributory negligence, and if there was error on that subject, it would be deemed invited error because the Plaintiff submitted the instruction, so I thought it was the burden of the defendant. ERICH: I have submitted proper instructions. COURT: I query you. Are instructions necessary to guide them on what they must consider in determination of ownership? ERICH: Well, your honor, when we first came over and instructions were prepared, and all through the case, I thought there was no question that would be raised because this is overwhelming [evidence] that it is her car, and if they find it was her car, then contributory negligence by imputation is a proper defense and it is pleaded, and I think I have met the burden of proving it. COURT: I hope this isn't an issue I will have to meet on a motion for a new trial where you have put The Court at this time. It is the position the Court now finds itself in with the jury waiting, the matter having been raised late, I will change this and hope we don't have to battle it out on a motion for a new trial. GOLDEN: *Do you think there should be further instruction if the car was community property of Maureen and Scott?* COURT: *If someone presents such a one, all right.* You will be arguing that. You will not be impeded in your arguments and these things are not going to be read before afternoon. I don't see how I will be able to instruct before noon. If we go out with the—the purpose of the instruction session is to set limits on what you can argue, and it is quite obvious you are going to argue ownership." (Italics ours.)

cautious *because the car belongs to you?* A. Yes, it was *my* car. I'm kind of particular about it." (Italics ours.) At that time there was no contention that the car had been changed by agreement into community property.

We suggest that at the time of the quoted colloquy (fn. 4) plaintiff's counsel was not as sure, as he argues now, that the record would have supported an instruction on transmutation. Secondly, it is to be remembered that every time in its instructions the court discussed a doctrine involving imputed negligence it would be bringing to each juror's mind Scott Mc-Cloud's "contributory" negligence—such negligence being admittedly present. Opposing counsel, of course, could be expected to stress such negligence in argument, but such argument does not have the impact of a court instruction. A jury naturally listens with special attention when the court speaks. Experienced trial lawyers try to keep to a minimum judicial references to topics unpleasant to their own cause. Most trial attorneys expect to win jury cases in the trial court (where most cases are won and lost). (And we believe that was the unrequited anticipation here.) It is only plaintiff's hindsight which has become 20-20. Unfortunately for her cause on appeal her reticence as recorded in the colloquy quoted (fn. 4) reveals her foresight then was less perceptive. ■ We hold that a trial court's duty to instruct a jury fully does not extend to an obligation to discuss a subject where, effectually, an appellant has been offered, and has refused, the giving of the Now requested instruction.

### Effect of General Verdict

■ Moreover, even if plaintiff were correctly contending that the jury was inadequately instructed on the transmutation issue and *sua sponte* instruction thereon was required despite plaintiff's unwillingness to submit or request such an instruction, reversible error would not be present. As noted above, a general defense verdict was returned. Under such circumstances, we are unable to ascertain which of the two defense theories submitted, (1) absence of negligence, or (2) imputed contributory negligence, was accepted by the jury. Evidence sufficient to support a finding that defendant Pugh was not guilty of negligence towards plaintiff is present in the record—abundantly present as we have noted. On appeal plaintiff makes no claim of insufficiency or of improper instructions on that issue.

■ We are thus bound by the rule of the Supreme Court in *Gillespie* v. *Rawlings* (1957) 49 Cal.2d 359, 369 [317 P.2d 601], which was stated as follows in *Posz* v. *Burchell* (1962) 209 Cal.App.2d 324, 335-336 [25 Cal.Rptr. 896]: ". . . Where several counts or issues are tried, a general

verdict will not be disturbed by an appellate court if a single one of such counts or issues is supported by substantial evidence and is unaffected by error, although another is also submitted to the jury without any evidence to support it and with instructions inviting a verdict upon it." (Also see cases reviewed at pp. 336-337.) This rule assumes that the jury found on the cause of action or theory which was supported by substantial evidence and as to which there was no error. (*Jones* v. *Evans* (1970) 4 Cal.App.3d 115, 119 [84 Cal.Rptr. 6].) As noted in *Rawlings* v. *Harris* (1968) 265 Cal.App.2d 452, 455 [71 Cal.Rptr. 288], "Objections to the underlying theory . . . have been overruled by the Supreme Court. This court is bound by the holding of the Supreme Court (*Auto Equity Sales, Inc.* v. *Superior Court* [1962] 57 Cal.2d 450, 455-456 . . .)." We are similarly bound. This is not to infer we deem ourselves unwillingly bound. (See fn. 1 to Justice Tobriner's concurring opinion in *Clark* v. *Gibbons* (1967) 66 Cal.2d 399, 415 [58 Cal.Rptr. 125, 426 P.2d 525].) The facts of this case illustrate why, properly applied, the existing rule is a good rule despite a blistering attack by a prominent lawyer text writer, the late Raymond Stanbury who brands the rule of *Gillespie* "unbelievable." (1 Stanbury, California Trial and Appellate Practice, § 622, p. 681.)

Many hours of labor by overcrowded courts at the appellate level (and in the trial court on new trial motions) are currently being unnecessarily spent reading or listening to Johnny-come-lately arguments the same as, or similar to, those advanced in the case at bench. A special verdict form was available here. (Code of Civil Procedure sections 624, 625, have been streamlined to give a trial court carte blanche in the matter of furnishing special verdict forms to the jury, and we have never known a trial judge to refuse a proper request by counsel to submit a special verdict form in a proper case—and a case involving both negligence and contributory negligence is obviously a proper case.) We are not deluded as to the reason why trial counsel do not favor use of such forms. Disuse does not stem from ignorance of their availability. Trial counsel shun them, adopting the same strategy which prompts reluctance (discussed above) to have the judge talk about the weaknesses of their case (even when those weaknesses are being qualified by conditions and limitations). When a special form taken into the jury room will focus special jury attention narrowed to a particular matter—a matter which the lawyer would prefer to have that jury gloss over or paint with a broad brush—its use is avoided. The law should frown on the playing of games by the trial advocate. Tricks are unnecessary to the preservation of the adversary system as we have learned, for example, in the formulation of the modern discovery rules. The too-frequent instances in which astucity is tolerated are fields for procedural reform. Parties should

have one chance (by request for special verdict forms) to have a jury's fact finding pinpointed. They should not be permitted to drag out litigation through the appellate courts by turning their backs upon safeguards afforded by the Legislature. When a general verdict is returned under circumstances where a special verdict might have been used, appellate courts have to guess which of several possible alternate routes the jury traveled to reach its destination. As this opinion is being written another thing this court must leave to conjecture is just how many appellate court hours are salvaged when we are spared that guessing game.

Perhaps what we have said in the last two pages was said better in the concurring opinion of a decision of this court, *Chabot* v. *Meredith* (1971) 15 Cal.App.3d 950, at page 958 [93 Cal.Rptr. 543]: "Appellate courts are wrestling with overwhelming caseloads. Well-conceived special verdicts simplify and often eliminate issues on appeal. (See, e.g., *Raymond* v. *Paradise Unified School Dist.* (1963) 218 Cal.App.2d 1 [31 Cal.Rptr. 847].) We should not permit the tactical choices of trial counsel to force abstract issues upon us. Rather, we should utilize opportunities to force counsel into requesting special verdicts. There is no problem in locating responsibility for the request. The responsibility rests with the party who will lose the verdict. Under the circumstances of the case, I do not reach the wilful misconduct issue." Moreover, truth ascertainment at trial would, it seems to us, be improved were a jury required thus to analyze its own thought processes—just as fact-finding aids a court in decisional determination.

### Denial of New Trial Motion

■ Plaintiff contends that the trial court's denial of her motion for new trial was improperly based on a misconception by the court of both its duty and its power. She argues that it is apparent from the court's memorandum that its decision was not based upon the independent evaluation of the evidence made by it, but rather on its determination that substantial evidence supported the initial decision of the jury. She further argues that the trial court's comments therein indicate that the court did not believe it had the legal discretion to grant a new trial for that reason even if it reached a different conclusion upon its review.

Examination of the court's memorandum does not support plaintiff's position. Rather it demonstrates compliance by the trial court with the rules that define its power and duty in ruling on plaintiff's motion, as well as a correct understanding of this duty and power. (Code Civ. Proc., § 657; 3 Witkin, Cal. Procedure (1954) Attack on Judgment in Trial Court, § 15,

pp. 2059-2061; Witkin, Cal. Procedure (1967 Supp.) Attack on Judgment in Trial Court, §§ 15, 15A, pp. 839-840.)[5]

There is nothing in the court's statement (fn. 5) to indicate either (a) a determination by the trial court that a contrary result was reached by him which should have been reached by the jury, or (b) that he was without power to nullify (by correction) the jury's verdict.

### No Miscarriage of Justice

Finally, this is a case, as revealed not only by the foregoing discussion but by a study of the not overly long or complicated record, regarding which it can be confidently asserted that a reasonable jury could not have reached a result favorable to plaintiff. The case not only should not have been appealed, it should not have been brought—even if we have labored overly tediously in deciding it. There was no miscarriage of justice as that term is intended to be applied in article VI, section 13, of the California Constitution. (See 3 Witkin, Cal. Procedure (1954) Appeal, § 100, p. 2268.)

Judgment is affirmed.

Friedman, Acting P. J., and Janes, J., concurred.

A petition for a rehearing was denied November 17, 1971, and appellant's petition for a hearing by the Supreme Court was denied December 23, 1971.

---

[5]In denying the motion, based solely on the claimed insufficiency of the evidence, the court, in relevant part, stated: "The arguments of plaintiffs in favor of their motion have been considered by the Court. Principally, it was argued that there was insufficient evidence to support the jury's verdict—or, even more widely, that in fairness and justice, the Court should not allow the verdict to stand even if, by Appellate Court standards, there were evidence to support it. The Court well realizes it has a certain amount of discretion in the consideration of motions for new trials and is not bound as strictly as is an Appellate Court. However, the Court is convinced that to grant a new trial here on such ground would be an abuse of discretion even though on consideration of the same evidence the Court *might* have arrived at a result different than the jury's verdict." (Italics ours.)