[No. A017717. First Dist., Div. Two. June 20, 1985.]

NAND KHANNA, Plaintiff and Respondent, v.
MICRODATA CORPORATION et al., Defendants and Appellants.

Counsel

Henry G. Kohlmann, Farrell L. Nelson, Collins, Amadeo, Knapp & Lechner and Craig Harris Collins for Defendants and Appellants.

Harry J. Delizonna and Gary M. Funamura for Plaintiff and Respondent.

OPINION

KLINE, P. J.—Microdata Corporation appeals from a judgment entered after a jury returned a general verdict awarding respondent Nand Khanna $22,858 in compensatory damages. The action was tried on causes of action for fraud (intentional misrepresentation), breach of contract, wrongful discharge, and breach of the implied covenant of good faith and fair dealing. The action arose out of the employment relationship between Microdata and respondent as its salesman. We affirm.

*Facts*

Viewing the evidence in the light most favorable to respondent (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]), the record discloses the following: During the early to mid-1970's respondent was employed as a computer salesman by a series of Bay Area electronics firms. In 1973 or 1974, while he was working for National Cash Register, respondent became acquainted with Richard Manuel, who was also involved in Bay Area computer sales. During the next several years respondent and Mr. Manuel had several professional contacts, and, at one time, Manuel tried to convince appellant to work as a sales representative for Xerox where he, Manuel, was then a branch manager.

In June of 1978, Manuel was hired by Microdata (a computer manufacturer) as the branch manager of its Burlingame sales office to form an in-house sales staff for Microdata products. The Burlingame office serviced San Francisco and its environs. Manuel had only one salesperson to cover the entire San Francisco territory when he took over the office. In an effort to fill out his sales staff, Manuel contacted respondent in early July of 1978 and offered him a job as a salesman with Microdata. At the time he received Manuel's offer, respondent had recently begun working as a salesman for Itel. Respondent told Mr. Manuel that he did not wish to leave Itel because it was considered an elite firm and desirable employer. Additionally, he did not want to get involved in a startup operation because of the extra work involved, and also did not want to commute from his home in San Jose to Microdata's Burlingame office.

Despite respondent's initial rejection of the job offer, Manuel persisted and eventually offered respondent the Van Waters and Rogers (VWR) account to entice him to change his mind. Van Waters and Rogers is a na-

tionwide consulting firm headquartered in San Mateo. At the time Manuel made the offer, it was anticipated that Microdata would be selling 13 to 15 computers to VWR with a total value of more than $1 million.

On the basis of Manuel's representations that he would be assigned the VWR account, respondent decided to leave Itel and join Microdata. The precise terms of respondent's responsibility for the VWR account were spelled out in a July 12, 1978, letter (the July 12 letter) from Manuel to respondent:

"I am pleased to confirm that the Van Waters & Rogers account will be assigned to you when you join Microdata Corporation in San Francisco. This assignment will be for a six month period to close the account if it is not physically located in your territory, and indefinitely if [as later turned out to be the case] it is located in your territory. If you close the account, it will be assigned to you for as long as it remains a Microdata customer.

"You will be paid a hardware commission at the rate of 4% if the [Microdata]/ESCOM hardware profit split is in force. If Microdata is able to negotiate a new hardware contract without any third party participation, then you will be paid full commission according to the compensation plan in effect at the time the deal is closed."

The "Microdata/ESCOM hardware profit split" mentioned in the letter referred to a situation in which Microdata computers would not be sold directly to VWR, but would instead be sold through a dealer, ESCOM, which would then sell the computers to VWR. If sales were made directly to VWR from Microdata, respondent was to receive the full commission provided by the Microdata compensation plan, which ranged from 8 to 12 percent of the sales price depending on the price of the particular unit sold. The lower 4 percent commission was necessary if Microdata sold through ESCOM because in that event ESCOM would share in the sale revenues. Manuel included the provision regarding the ESCOM hardware split because prior to the time Manuel offered the account to respondent, Microdata was obliged pursuant to a letter of intent with ESCOM and VWR to supply computers to VWR through ESCOM. In addition to acting as a conduit for the sale of the hardware, ESCOM was to design and supply the software.

Most important, respondent understood the July 12 letter to mean that he would receive a commission of at least 4 percent on *any* Microdata computer sold to VWR, regardless of who actually sold the computer or where it was installed. This understanding was based on the fact that VWR was a national account with headquarters located in respondent's territory.

Relying on Manuel's representations and his understanding of the commission arrangement, respondent quit Itel and commenced employment with Microdata in mid-July of 1978.

During the first few months of his employment with Microdata, respondent expended time and effort in an attempt to land the VWR account. Eventually, however, Manuel directed respondent to stop working on the VWR account because Microdata had reached a final agreement with ESCOM whereby the latter would provide both the software and the actual Microdata computers to VWR as a retail dealer. Thus, although Microdata would still make a profit on the sale through ESCOM, there was no longer a need to directly pitch their product to VWR.

Respondent apparently agreed to stop working on the account, but asked Manuel how he was to be compensated under the terms of the July 12 letter. Manuel subsequently recommended to his superiors that respondent be compensated for the time and effort he spent on the VWR account, but told respondent that he should " 'just forget about the July 12th letter.' " Respondent continued working on his other Microdata accounts, and made occasional inquiries regarding his compensation for the VWR account. Eventually, he was shown a November 7, 1978, confidential memo from Rene Caron, Microdata's president for domestic sales, to Mr. Manuel which concerned respondent's compensation for sales to VWR through ESCOM. This memo unilaterally provided that respondent would receive 60 percent of the normal commission for direct sales of computers[1] for units sold to VWR and *actually installed within the San Francisco branch territory*. Respondent believed the memo was inconsistent with the terms of the July 12 letter, which he understood gave him a right to a commission regardless where the computers were installed.

In December of 1978 ESCOM sold one computer to VWR. Under the terms of the November 7 memo respondent was entitled to a commission of $4,785 for the sale. Microdata claims that it has always acknowledged this commission was owed to respondent, but, because of an "administrative foul up" it has never been credited to respondent's commission account.

In November of 1979 respondent wrote to Rene Caron and indicated he had not received a commission for any sales to VWR. In his letter, respondent maintained that he was entitled to be compensated under the terms of the July 12 letter, and expressed his inability to understand "why there is any question about this obligation." Mr. Caron responded, in essence, that

---

[1] This amounted to 60 percent of the commissions ranging from 8 to 12 percent, which equals 4.8 percent to 7.2 percent of the total sales price.

Microdata would not respect the terms outlined in the July 12 letter, but would compensate respondent under the terms of the "agreement" embodied in Caron's November 7, 1978, memo to Mr. Manuel. In response, respondent indicated he had never agreed to the November 7, 1978, memo and felt entitled to be compensated under the terms of the July 12 letter.

Finally, in December of 1979, respondent's retained counsel wrote to Donald Graham, the president of Microdata, stating he would file suit on behalf of respondent if a satisfactory reply regarding the compensation issue was not received in 10 days. No reply was received from Microdata, and respondent's then counsel filed a civil action against Microdata in December 1979 to recover the commission allegedly due him under the July 12, 1978, agreement. That lawsuit asked the court to award respondent $210,000 in compensatory damages and $500,000 in punitive damages. The gravamen of the suit was an allegation by respondent that there had been a $1.75 million sale to VWR, and that respondent was entitled to a commission on this sale. The $210,000 figure was arrived at by multiplying the alleged sales price of $1.75 million by 12 percent, the maximum commission respondent would have made if he had sold the computers directly to VWR. Respondent testified that the $1.75 million figure was based on the number of computers he believed VWR would shortly purchase from Microdata.

Respondent continued to exercise his best efforts to sell Microdata products even after he filed his lawsuit. The record is replete with evidence that respondent met and surpassed the sales expectations of his superiors during his tenure with Microdata. Respondent was on several occasions praised by his superiors for his excellent sales performance, which was as much as 149 percent of his monthly sales quota. In October of 1980, just six weeks before he was terminated, respondent was ranked as the sixth best Microdata salesman in the United States. Samuel Cochrane, who later replaced Mr. Manuel as the San Francisco branch manager, felt respondent was the top San Francisco salesman at the time he was terminated in December of 1980. Mr. Manuel also testified that he had, and still has, a "very high regard for Andy's sales capabilities."

After respondent filed his suit, his trial counsel engaged in extensive discovery. Respondent deposed several vice presidents as well as the president of Microdata, and made detailed examinations of the business records of Microdata and VWR. Despite this extensive discovery no solid evidence was produced of any sale of Microdata computers to VWR other than the single December 1978 sale previously mentioned for which Microdata acknowledged respondent was due a commission of $4,785 under the November 7 memo.

Nevertheless, on his counsel's advice, respondent proceeded with his lawsuit. His jury trial was set for December 9, 1980. Unfortunately, however, respondent's then counsel neglected to post the required jury fees, and, on the day trial was to begin, the court ordered the trial to proceed without a jury. Respondent, who was understandably upset by his attorney's neglect, discharged his counsel and was granted a continuance to obtain new counsel.

On the same date he was deprived of a jury trial respondent received notice of his termination from Rene Caron. The letter indicated that "termination is necessary because of your inability to maintain what Microdata considers to be a normal employee relationship. Your actions in bringing suit against Microdata based on totally unfounded representations as to commitments of Microdata and its personnel can only be construed as disloyalty. Such disloyalty cannot be permitted." No other reason for termination was given.

At the time he was fired respondent had commissions pending on nearly $250,000 worth of sales and leases for computers which had been ordered but had not yet been installed or paid for. Respondent was not paid a commission on these sales because the compensation plan under which respondent was employed provided that when an account manager's employment was terminated, regardless of the reason, he had no right to collect a commission on sales that were not booked, installed, and paid for before termination. All Microdata account managers (salesmen) were required to execute the Microdata compensation plan, which contained this forfeiture provision, and to sign an acknowledgement that they had read the plan and understood their compensation would be governed by its provisions. The compensation plan was a lengthy document outlining in detail the rights and duties of account managers. Respondent signed an acknowledgement that he had read and agreed to be governed by the compensation agreement covering calendar 1980. The compensation plans were presented to the salesmen on a take it or leave it basis, with no opportunity to bargain or negotiate its terms.

After he was fired, respondent retained new counsel who dismissed the lawsuit against Microdata without prejudice to the filing of a new suit. Respondent instructed his counsel not to immediately file a new lawsuit in order to provide Microdata an opportunity to make good on his commissions. Respondent made repeated requests for a final commission settlement statement as required by the 1980 compensation plan, but never received one. Finally, in January of 1981, respondent's counsel filed the instant lawsuit alleging causes of action for fraud (intentional misrepresentation), wrongful discharge, breach of the implied covenant of good faith and fair dealing, and breach of employment contract. The jury was instructed on all

causes of action, and returned a general verdict for $22,858 in compensatory damages. This appeal followed.

*Discussion*

A.

*Nature of Review on Appeal*

■ As indicated above, the judgment was entered on a general jury verdict. This greatly simplifies our task on appeal since it is well established that "[w]here several counts or issues are tried, a general verdict will not be disturbed by an appellate court if a single one of such counts or issues is supported by substantial evidence and is unaffected by error . . . ." (*Posz v. Burchell* (1962) 209 Cal.App.2d 324, 335-336 [25 Cal.Rptr. 896]; see also, *Gillespie* v. *Rawlings* (1957) 49 Cal.2d 359, 368-369 [317 P.2d 601]; *Louisville Title Ins. Co.* v. *Surety Title & Guar. Co.* (1976) 60 Cal.App.3d 781, 786 [131 Cal.Rptr. 63]; *McCloud* v. *Roy Riegels Chemicals* (1971) 20 Cal.App.3d 928, 935-936 [97 Cal.Rptr. 910].) This rule requires that we assume the jury found on the cause of action which is supported by substantial evidence and is free of error. (*McCloud, supra,* 20 Cal.App.3d at p. 936.)

Thus, our task in this appeal is narrowly circumscribed: we are merely required to find that one of the four causes of action alleged by respondent is supported by substantial evidence and is unaffected by error.

We find the verdict is supported by the cause of action alleging violation of the implied covenant of good faith and fair dealing which is implied in every contract including a contract of employment. Since we find the verdict may be supported on this theory, we do not address respondent's alternative arguments directed against the causes of action on other theories of wrongful discharge, fraud, and for breach of contract.

B.

*"At-will" Employment and the Law of
Wrongful Discharge*

After initially contending that respondent was employed as an at-will employee, and could therefore be discharged with or without cause, appellant alternatively contends that, even if the employment was not at-will, appellant established *as a matter of law* that there was good cause for discharging

respondent. In short, appellant maintains that "the facts . . . establish" respondent was discharged for disloyalty because he continued to prosecute his lawsuit even when he realized it was unmeritorious.

The contract under which respondent was employed was for an indefinite term and respondent may therefore be described as an "at will" employee of Microdata. "Under the traditional common law rule, codified in Labor Code section 2922, an employment contract of indefinite duration is in general terminable at 'the will' of either party. ██ Over the past several decades, however, judicial authorities in California and throughout the United States have established the rule that under both common law and the statute an employer does not enjoy an absolute or totally unfettered right to discharge even an at-will employee. In a series of cases arising out of a variety of factual settings in which a discharge clearly violated an express statutory objective or undermined a firmly established principle of public policy, courts have recognized that an employer's traditional broad authority to discharge an at-will employee 'may be limited by statute . . . or by considerations of public policy.' [Citations.]" (*Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 172 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R. 4th 314], fn. omitted.)

"The absolute power conferred by Labor Code section 2922 on an employer to discharge the at-will employee without cause is founded on the contractual concept of mutuality of obligation. The reasoning is that, since an employee may terminate the employment relationship when he wishes to do so, the employer also is entitled to terminate the relationship at his pleasure. However, when viewed in the context of present-day economic reality and the joint, reasonable expectations of employers and their employees, the 'freedom' bestowed by the rule of law on the employee may indeed be fictional." (*Cleary* v. *American Airlines, Inc.* (1980) 111 Cal.App.3d 443, 448-449 [168 Cal.Rptr. 722].)

██ Another district of the Court of Appeal has recently and we believe accurately categorized the emerging theories which limit an employer's absolute right to discharge an employee without cause. In *Shapiro* v. *Wells Fargo Realty Advisors* (1984) 152 Cal.App.3d 467 [199 Cal.Rptr. 613], the court found three distinct theories have developed to limit an employer's right to discharge an "at-will" employee: "(1) a tort cause of action for wrongful discharge in violation of public policy (*Tameny* v. *Atlantic Richfield Co., supra,* 27 Cal.3d 167); (2) a cause of action for employer's breach of the implied covenant of good faith and fair dealing, which sounds in tort and contract (*Cleary* v. *American Airlines, Inc., supra,* 111 Cal.App.3d 443); and (3) a cause of action for employer's breach of an implied-in-fact covenant to terminate only for good cause (*Pugh* v. *See's Candies, Inc.*

(1981) 116 Cal.App.3d 311 . . . .)" (*Id.*, at pp. 475-476; see also, *Crosier v. United Parcel Service, Inc.* (1983) 150 Cal.App.3d 1132, 1137 [198 Cal.Rptr. 361]; Miller & Estes, *Recent Judicial Limitations On the Right to Discharge: A California Trilogy* (1982) 16 U.C. Davis L.Rev. 65.)

Although elements of all three "wrongful discharge" theories are present here, we choose, as we may in this case, to focus on the cause of action for the employer's breach of the implied covenant of good faith and fair dealing implied by law in the contract.

## C.

### The Implied Covenant of Good Faith and Fair Dealing as the Basis for a Claim of Wrongful Discharge.

The California wrongful discharge cause of action based on the breach of the implied covenant of good faith and fair dealing emanates from a footnote at the conclusion of Justice Tobriner's opinion in *Tameny v. Atlantic Richfield Co., supra,* 27 Cal.3d 167. In *Tameny,* the Supreme Court recognized that a cause of action for "wrongful discharge" sounds in tort, and may be established by a showing that the reasons for discharge "violated an express statutory objective or undermined a firmly established principle of public policy." (*Id.*, at pp. 172, 176; see cases cited at p. 172.) This is the basis for the first theory of wrongful discharge outlined in *Shapiro v. Wells Fargo Realty Advisors, supra,* 152 Cal.App.3d at pp. 475-476. The court in *Tameny* found that an employee who has been discharged for refusing to participate in illegal price fixing schemes may maintain an action for wrongful discharge against his employer. On the basis of public policy and statutory law, the court held that "an employer's authority over its employee does not include the right to demand that the employee commit a criminal act to further its interests, and an employer may not coerce compliance with such unlawful directions by discharging an employee who refuses to follow such an order. An employer engaging in such conduct violates a basic duty imposed by law upon all employers, and thus an employee who has suffered damages as a result of such discharge may maintain a tort action for wrongful discharge against the employer." (*Id.*, at p. 178.)

More important for present purposes, Justice Tobriner's footnote in *Tameny* recognized that a tort might also be established on the ground that an

employer's discharge of an at-will employee violated the employer's "good faith and fair dealing" obligations.[2]

Shortly thereafter, in *Cleary* v. *American Airlines, Inc., supra,* 111 Cal.App.3d 443, the Court of Appeal firmly established a cause of action for wrongful discharge based upon the implied covenant of good faith and fair dealing which exists in every employment contract. (*Id.,* at pp. 453, 454-456; Miller & Estes, *supra,* 16 U.C. Davis L.Rev. at p. 83.) In *Cleary,* the plaintiff, whose complaint was dismissed upon demurrer, alleged that he was employed by American Airlines from 1958 to 1976 when he was dismissed due to the airline's disapproval of his union activities. He further asserted that the reasons given for his discharge (theft and other offenses) were untrue and that he was not provided an opportunity to rebut the charges against him, in violation of the airline's own employment policies and procedures. (*Cleary, supra,* 111 Cal.App.3d at pp. 447-448.) After surveying cases that have limited an employer's right to discharge "at-will" employees (*id.,* at pp. 450-453), the *Cleary* court found there was an implied covenant of good faith and fair dealing implied by law in every employment contract. (*Id.,* at pp. 453, 455.) The court went on to find that the plaintiff in *Cleary* had pled facts sufficient to show the implied covenant had been breached. In doing so the court emphasized two factors in particular: (1) the longevity of the plaintiff's satisfactory service (18 years); and (2) the airline's failure to abide by its own procedures for adjudicating employee disputes. (*Id.,* at p. 455.) The court held "that the longevity of the employee's service, together with the expressed policy of the employer, operate as a form of estoppel, precluding any discharge of such an employee by the employer without good cause." (*Id.,* at p. 456.)

---

[2]The footnote states as follows: "In light of our conclusion that plaintiff's complaint states a cause of action in tort under California's common law wrongful discharge doctrine, we believe it is unnecessary to determine whether a tort recovery would additionally be available under these circumstances on the theory that Arco's discharge constituted a breach of the implied-in-law covenant of good faith and fair dealing inherent in every contract. We do note in this regard, however, that authorities in other jurisdictions have on occasion found an employer's discharge of an at-will employee violative of the employer's 'good faith and fair dealing" obligations (see *Fortune* v. *National Cash Register Co.* (1977) 373 Mass. 96 [364 N.E.2d 1251, 1257]; cf. *Monge* v. *Beebe Rubber Company* (1974) 114 N.H. 130 [316 A.2d 549, 62 A.L.R.3d 264]), and past California cases have held that a breach of this implied-at-law covenant sounds in tort as well as in contract. (See, e.g., *Comunale* v. *Traders General Ins. Co.* (1958) 50 Cal.2d 654, 663 [328 P.2d 198, 68 A.L.R.2d 883]; *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 432-433 [58 Cal.Rptr. 13, 426 P.2d 173]; *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 574 [108 Cal.Rptr. 480, 510 P.2d 1032].) Since neither plaintiff nor defendants suggest that the elements of a cause of action for breach of the implied covenant in this context would differ from the elements of an ordinary wrongful discharge action, however, we believe that a separate discussion of the 'good faith and fair dealing' covenant in this case is unnecessary." (*Tameny* v. *Atlantic Richfield Co., supra,* 27 Cal.3d at p. 179, fn. 12.)

Several cases subsequent to *Cleary* have acknowledged the implied covenant of good faith and fair dealing is implied by law in employment contracts, and that a tort cause of action for wrongful discharge can be established by showing a breach of that covenant. (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, at p. 769, fn. 6 [206 Cal.Rptr. 354, 686 P.2d 1158], see also conc. and dis. opn. of Bird, C.J., at pp. 775-776; *Rulon-Miller* v. *International Business Machines Corp.* (1984) 162 Cal.App.3d 241, 247-248 [208 Cal.Rptr. 524]; *Wallis* v. *Superior Court* (1984) 160 Cal.App.3d 1109, 1116, fn. 2 [207 Cal.Rptr. 123]; *Shapiro* v. *Wells Fargo Realty Advisors, supra,* 152 Cal.App.3d at pp. 478-479; *Crosier* v. *United Parcel Service, Inc., supra,* 150 Cal.App.3d at p. 1137; *Rosenfeld, Meyer & Susman* v. *Cohen* (1983) 146 Cal.App.3d 200, 215 [194 Cal.Rptr. 180]; *Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311, 327-329 [171 Cal.Rptr. 917].)

In the present case, appellant concedes that a covenant of good faith and fair dealing is implied in every employment contract, but maintains that a very specific showing must be made by respondent to establish that the covenant has been breached, and that no such showing was made in this case. Specifically, appellant claims the doctrine is limited to the facts of *Cleary*: that is, a breach can be shown only where (1) the employee can establish lengthy satisfactory service; and (2) the employer acted contrary to its own conflict resolution policies and procedures or otherwise acted arbitrarily in discharging the employee. (See *Cleary* v. *American Airlines, Inc., supra,* 111 Cal.App.3d at pp. 455-566; *Cancellier* v. *Federated Dept. Stores* (9th Cir. 1982) 672 F.2d 1312, 1318; *Shapiro* v. *Wells Fargo Realty Advisors, supra,* 152 Cal.App.3d at p. 478.) We cannot agree with appellant that the factors relied on by the court in *Cleary* are the *sine qua non* to establishing a breach of the covenant of good faith and fair dealing implied in every employment contract. The cases subsequent to *Cleary* discussing the breach of the implied covenant in employment contracts have indicated that the theory of recovery articulated in *Cleary* is not dependent on the particular factors identified in that case. (*Shapiro* v. *Wells Fargo Realty Advisors, supra,* 152 Cal.App.3d at pp. 478-479; *Crosier* v. *United Parcel Service, supra,* 150 Cal.App.3d at p. 1137-1138.) ■ To the contrary, a breach of the implied covenant of good faith and fair dealing in employment contracts is established whenever the employer engages in "bad faith action extraneous to the contract, combined with the obligor's intent to frustrate the [employee's] enjoyment of contract rights." (*Shapiro, supra,* 152 Cal.App.3d at pp. 478-479, citing *Sawyer* v. *Bank of America* (1978) 83 Cal.App.3d 135, 139 [145 Cal.Rptr. 623].) The facts in *Cleary* establish only one manner among many by which an employer might violate this covenant.

It is true that in *Newfield* v. *Insurance Co. of the West* (1984) 156 Cal.App.3d 440 [203 Cal.Rptr. 9], heavily relied upon by appellant at oral argument, the court states that a violation of this implied covenant of good faith and fair dealing cannot be made out "on that naked covenant alone," and that judicial rulings in which violations have been found "were *always* predicated upon other public policy grounds, statutory violations, or express (or clearly implied) contract grounds, or upon a combination of elements (e.g. especially longevity of service together with some added element . . .)" (*Id.,* at p. 445, italics in original.) Even if this statement were correct, the mere fact that in past cases a violation of the implied covenant has been predicated on a limited variety of factual grounds does not in and of itself mean that those are the *only* grounds that will in the future suffice. Moreover, the statement in *Newfield* to which appellant attaches such great importance was gratuitous, as in that case the cause of action for breach of the covenant of good faith and fair dealing was held barred by the statute of frauds. (*Id.,* at p. 446.)

 The true reasons for an employee's dismissal, and whether they show bad faith rather than dissatisfaction with services and reflect intention to deprive the discharged employee of the benefits of the contract, are evidentiary questions most properly resolved by the trier of fact. (*Crosier* v. *United Parcel Service, Inc., supra,* 150 Cal.App.3d at pp. 1138-1139 and cases there cited; see also *Rulon-Miller* v. *International Business Machines Corp., supra,* 162 Cal.App.3d at p. 253.) Thus, the inquiry on this appeal is simply whether there is substantial evidence in the record to support an implied jury finding that Microdata engaged in bad faith action, extraneous to the contract, with the motive intentionally to frustrate respondent's enjoyment of his contract rights. We find that there is such evidence.

Appellant does not dispute that respondent was terminated solely for commencing and continuing his lawsuit against Microdata. Therefore, as we see it, the factual issue presented to the jury was whether Microdata discharged respondent in good faith because the lawsuit genuinely interfered with his ability to perform his job and amounted, in appellant's eyes, to disloyalty, or, alternatively, whether Microdata discharged respondent in bad faith retaliation for bringing the suit and for the purpose of denying him the benefits of his employment.[3] Although the evidence did not compel a finding that,

---

[3]*Becket* v. *Welton Becket & Associates* (1974) 39 Cal.App.3d 815, 821 [114 Cal.Rptr. 531], does provide authority for the proposition that "public policy" does not limit the power of an employer to discharge under an "at will contract" in retaliation for the filing of a lawsuit against the employer. However, the theory adopted in *Becket* would insulate the employer only against tort liability grounded on a violation of public policy; it would not shield him against a cause of action for breach of the implied-in-law covenant of good faith and fair dealing, which sounds in contract as well as in tort. (*Tameny* v. *Atlantic*

through its agents, Microdata acted in bad faith, it did provide a substantial basis for the jury to infer bad faith. First of all, given the manifest discrepancy between the July 12 letter assigning the VWR account to respondent and the November 7, 1978 confidential memo to Manuel from Rene Caron, which appeared to alter the terms of the July 12 letter to respondent's substantial disadvantage, the jury may have determined that respondent's lawsuit was not at all "totally unfounded" and that this false characterization of his suit was advanced merely as a pretext to fire respondent. (*Rulon-Miller, supra,* 162 Cal.App.3d at p. 253.) Further, respondent's outstanding sales performance, which inured to the benefit of Microdata, and the praise he received from his superiors on several occasions, belied the claim that respondent was sincerely thought to be "disloyal." Additionally, the fact that respondent was terminated on the very same day and immediately after he lost his right to a jury trial and fired his lawyer—a point at which it may have appeared respondent would abandon his lawsuit and relieve Microdata of judicial scrutiny—would support an inference that the termination was retaliatory.

Moreover, even if, as appellant maintains, the lawsuit initially filed was unjustified because, after discovery revealed no additional computer sales to VWR, respondent knew that commissions on such sales were not improperly withheld from him, the record suggests respondent had other sound reasons for continuing to litigate. For example, during closing argument, respondent's counsel argued that he was prosecuting his action to recover the $4,785 commission for the single computer sale to VWR that was previously made, and was also attempting to establish the validity and terms of the July 12 compensation contract in the event future sales were made to VWR. Thus, despite the revelation of no current sales to VWR, respondent's initial lawsuit was not as specious as appellant would have us believe.

Finally, the fact that the termination operated to prevent respondent from receiving commissions on nearly $250,000 worth of sales on computers not yet installed certainly would support the inference that the termination was intended to deprive him of these benefits.

In sum, and though the evidence may not be overwhelming, we conclude that the record contains substantial evidence to support factual inferences that appellant fired respondent in bad faith retaliation for bringing his lawsuit and intended to deprive him of the benefits of his employment contract.

---

*Richfield Co., supra,* 27 Cal.3d at p. 179, fn. 12, and cases there cited.) Breach of this implied covenant does not depend on whether any extrinsic "public policy" has been offended by the employer's action, but on whether the challenged dismissal reflects bad faith and an intent to frustrate the employee's enjoyment of contract rights.

## D.

### *Instructional Error*

In a final attack on the cause of action for breach of the implied covenant of good faith and fair dealing, appellant claims the trial court erroneously instructed the jury so as to improperly shift the burden of proof on this issue.

Defendant offered an instruction at trial which essentially quoted Labor Code section 2922 on at-will employment: "An employment, having no specified term may be terminated at the will of either party on notice to the other. Employment for a specified term means an employment for a period of greater than one month." The trial court accepted the instruction, but qualified it by adding at the end "however, such termination may not be done in bad faith."

Appellant now claims the trial court's modification "effectively shifted the burden of proof from the Respondent to prove that Appellant did not act in good faith to . . . Appellant having to prove it did not act in bad faith." We reject this claim.

While we agree with appellant that the burden was ultimately on respondent to prove Microdata breached its duty to deal with him fairly and in good faith (*Crosier* v. *United Parcel Service, Inc., supra,* 150 Cal.App.3d at pp. 1137-1138; *Pugh* v. *See's Candies, Inc., supra,* 116 Cal.App.3d at pp. 329-330), we do not believe that the instruction quoted above effectively shifted the burden of proof as appellant claims. An earlier instruction read to the jury specifically stated that "the plaintiff has the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issues: . . . *That the defendant breached its duty to deal fairly and in good faith with the plaintiff;* [¶] The nature and extent of the damages proximately caused by such breach . . ."

Even if we accept the rather questionable proposition that the instruction to which appellant objects somehow shifted the burden to Microdata to show absence of bad faith, we believe this error was cured by the earlier instruction which accurately and clearly allocated the burden of proof. (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 314, p. 4292.) Appellant's argument is totally meritless.

### E.

### *Disposition*

The judgment is affirmed.

Rouse, J., and James, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.