[No. D004601. Fourth Dist., Div. One. Aug. 4, 1987.]

ROBERT PREVOST, Plaintiff and Appellant, v.
FIRST WESTERN BANK, Defendant and Respondent.

1494

COUNSEL

James C. Stevens, Jerry D. Cluff and Pain, Cluff & Olson for Plaintiff and Appellant.

Richard E. Gattis, Timothy P. Kindelan and Steven J. Cote for Defendant and Respondent.

OPINION

WIENER, J.—Plaintiff Robert Prevost appeals from summary judgment entered in favor of defendant First Western Bank in an action arising from Prevost's termination from employment and the bank's accusation that he accepted a gratuity in connection with processing of loan. We conclude the court erred in granting First Western's motion for summary judgment and therefore reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

First Western hired Prevost as a loan officer on December 12, 1983, at a salary of $20,000 a year. Prevost's duties included gathering data on loan applicants, evaluating that data and preparing loan packages for presentation to his superiors for approval. The terms of the oral employment agreement provided for a 90-day probationary period. First Western provided Prevost with a copy of its personnel policy manual which included the following paragraph regarding probationary status: "All new employees are hired on a trial basis for the first 3 months. This period gives the new

employee time to see if he really likes the work and permits the bank to replace those who don't measure up to our standards. Each new employee is to be reviewed at the end of the 3 month probationary period. Comments in writing regarding the general performance evaluation at this point will be placed in the personnel file. The employee's job strengths and weaknesses should be discussed in detail and areas of improvement stressed. Job weaknesses or potential problem areas discovered during the probationary period should be reviewed with the employee immediately. A good understanding of the new employee's abilities and future potential should be achieved during this period. If it is evident that excessive problems or deficiencies exist, consideration should be given to terminating the employment relationship during the probationary period. Such action will first be discussed with the bank's president."

In February 1984 Paul J. Crock applied to First Western for a $200,000 loan on behalf of his corporation, Paul J. Crock, Inc. Marco Toorop, the bank's executive vice president, asked Prevost to prepare the loan package. The Crock loan was approved by the loan committee and funded in March 1984.

While First Western was processing the loan, Crock approached several bank employees, including Prevost, about purchasing a condominium unit he had for sale. Prevost expressed an interest and on March 30, 1984, Prevost purchased the condominium from Crock for $65,000 and no money down. Prevost agreed to rent the condominium to Crock's daughter for one year at a reduced rent. He also agreed to pay fees for escrow, title insurance, termite inspection and other incidental expenses. Prevost stated he negotiated the purchase only after informing Robert McNeil, the bank president.

Meanwhile, Toorop and McNeil were engaged in a power struggle over presidency of the bank. Toorop had informed Prevost on March 11, 1984, that Prevost was "his boy" and could look forward to a long and successful career at First Western. The next day Toorop told Prevost he would be taking McNeil's place as president and suggested Prevost align himself with Toorop. Prevost told McNeil about Toorop's comments.

On March 13, immediately after completion of the 90-day probationary period, Toorop dismissed Prevost from his job as a loan officer. Prevost had not been informed that his work was in any way deficient or that dismissal was being contemplated. McNeil was not consulted about Prevost's termination and did not approve Toorop's actions. McNeil resigned later the same day. First Western later informed a potential employer that Prevost had been terminated because he was not following standard operating pro-

cedures regarding loans, lacked regard for customer's privacy, and the bank had received a number of customer complaints about him.

While reviewing the loan file in January 1985 after Crock defaulted on the loan, the new bank president James Hildreth discovered that Prevost had purchased the condominium from Crock for $65,000 at 100 percent financing within 30 days after the loan was approved. He also discovered that Prevost had failed to report the transaction to First Western's board of directors. Believing Prevost might have violated 18 United States Code section 215 governing the acceptance of gratuities by bank officers in connection with the transaction of bank business, Hildreth filed a proof of loss statement with the bank's bonding company stating that Prevost "received preferential treatment in the purchase of said condominium as a gratuity for the approval of this loan."

Prevost sued First Western for libel, breach of contract, breach of implied covenant of good faith and fair dealing, and intentional and negligent infliction of emotional distress. First Western's general denial raised several affirmative defenses, including allegations that statements made in the proof of loss statement were true and absolutely privileged. First Western successfully moved for summary judgment and this appeal ensued.

DISCUSSION

I

A.

Prevost's first cause of action alleges that First Western's filing of the proof of loss statement with the bonding company falsely accused him of committing a federal crime and constituted libel on its face. In its motion for summary judgment First Western argued the communication was absolutely privileged under Civil Code section 47, subdivision 2, because the bank was required by federal regulation[1] to notify its bonding company, in

---

[1] The Office of Comptroller of Currency (OCC) is authorized to issue rules and regulations for national banks as part of its regulatory responsibility. (12 U.S.C. § 93(a).) The OCC enacted 12 Code of Federal Regulations section 7.5225 which provides in relevant part: "(a) An immediate written report shall be made by an appropriate officer of the bank to the Regional Administrator of National Banks, the nearest office of the FBI, the U. S. attorney for the bank's district, and *the bonding company,* of any of the following events:

"(1) Any known or suspected theft, . . . or other defalcation involving bank personnel or bank funds in any amount. Where there is reason to suspect any person or persons in connection with the event, the identity of such persons and the reason for suspicion shall be included in the report.

addition to various regulatory and law enforcement agencies, of known or suspected violations of the United States Code. We conclude the court erred in ruling the communication was absolutely privileged.

The defense of privilege in defamation actions "presents a conflict . . . between two principles equally regarded by the law—the right of the individual, on one hand, to enjoy his reputation unimpaired by defamatory attacks, and, on the other hand, the necessity, in the public interest, of a free and full disclosure of facts in the conduct of the legislative, executive and judicial departments of the government." (Veeder, *Absolute Immunity in Defamation: Judicial Proceedings* (1909) 9 Colum.L.Rev. 463.)

Civil Code section 47 defines various classifications of privileged communications. Subdivision 2 states in part: "A privileged publication or broadcast is one made—

"2. In any (1) legislative or (2) judicial proceeding, or (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable [by writ of mandate]. . . ." ■ The focus of Civil Code section 47, subdivision 2 is the *proceeding* in which the publication occurs, not the fact, as argued by First Western, that the defendant is required by law to make the publication. "When the occasion arises, the right arises; when the occasion is past— when the facts or relation cease to exist—the right disappears." (Veeder, *supra,* 9 Colum. L. Rev. at p. 468.)

First Western's defense of absolute privilege emphasizes the phrase "in any other official proceeding authorized by law." Our courts interpret this language to encompass "those proceedings which resemble judicial and legislative proceedings, such as transactions of administrative boards and quasi-judicial and quasi-legislative proceedings." *(Ascherman* v. *Natanson* (1972) 23 Cal.App.3d 861, 865 [100 Cal.Rptr. 656].) Three primary factors determine the nature of these proceedings: (1) whether the administrative body is vested with discretion based upon investigation and consideration of evidentiary facts, (2) whether it is entitled to hold hearings and decide the issue by the application of rules of law to the ascertained facts and (3) whether its power affects the personal or property rights of private persons. *(Id.* at p. 866.) It is not enough that state law requires the creation of, for example, a review committee. Civil Code section 47, subdivision 2 applies exclusively to government agencies. *(Hackethal* v. *Weissbein* (1979) 24 Cal.3d 55, 61 [154 Cal.Rptr. 423, 592 P.2d 1175, 9 A.L.R.4th 791].)

---

"(2) Any state of facts growing out of the affairs of the bank known or suspected to involve criminal violation of any other section of the United States Code. . . ." (12 C.F.R. § 7.5225 (1984), italics supplied.)

Our resolution of this issue is controlled by *Slaughter* v. *Friedman* (1982) 32 Cal.3d 149 [185 Cal.Rptr. 244, 649 P.2d 886], a defamation action by an oral surgeon against a private insurance company and its director based on a letter sent to claimants describing certain of the plaintiff's dental work as "unnecessary" and stating that claims involving plaintiff would no longer be processed by the company because of "overcharging." The court concluded Civil Code section 47, subdivision 2 was inapplicable because the private processing of dental claims could not be deemed part of any "official proceeding authorized by law." Although the insurance company was required by both federal and state law to provide claimants with reasons for denial of claims, the insurance company was not an "official" acting in an "official capacity." ■ Here both First Western and the bonding company are private entities. There is no evidence to show that actions by the bonding company in response to the proof of loss could be deemed judicial or quasi-judicial in nature. First Western attempts to distinguish *Slaughter* on grounds the bank's failure to comply with the OCC's reporting requirements subjected the bank to a $100 per day penalty, but no criminal sanctions resulted from the failure to disclose grounds for denial of the dental insurance claims. Because Civil Code section 47, subdivision 2 focuses on the proceeding in which the publication occurs rather than on the legal requirement to communicate, sanctions for violation of disclosure requirements are irrelevant to the existence of absolute privilege.

First Western failed to plead the defense of qualified privilege under Civil Code section 47, subdivision 3 or argue qualified privilege in its motion for summary judgment. Thus there was no reason for Prevost to counter the defense by introducing evidence of malice. The issue of qualified privilege is not properly before us in this appeal.

### B.

■ Having concluded the proof of loss statement was not subject to absolute privilege under Civil Code section 47, subdivision 2, we next consider whether there is a triable issue as to the truth or falsity of that communication, that is, whether Prevost accepted preferential treatment in the purchase of Crock's condominium in violation of 18 United States Code section 215.

During the relevant period 18 United States Code section 215 provided: "(a) Whoever, being an officer, director, employee, agent, or attorney of any financial institution . . . except as provided by law, directly or indirectly, asks, demands, exacts, solicits, seeks, *accepts, receives or agrees to receive anything of value,* for himself or for any other person or entity, other than such financial institution, from any person or entity for *or in connection with*

*any transaction* or business of such financial institution; or [¶] . . . shall be fined not more than $5,000 or three times the value of anything offered, asked, given, received or agreed to be given or received, . . . whichever is greater, or imprisoned not more than five years, or both; . . ." (98 Stat. 2146, 18 U.S.C. § 215; italics supplied.) Thus the key questions to be decided at trial are whether Prevost received anything of value from Crock and, if so, whether that "gift" had any connection with Crock's loan. There is clearly a factual conflict on this latter point. One inference that can be drawn from the declarations is that Prevost, with limited lending authority, merely prepared the loan package and accordingly had nothing to do with the ultimate approval of the Crock loan.

There is also a question as to whether Prevost accepted or received "anything of value." Although Prevost testified that at the time he purchased his unit he knew the condominiums were worth at least $70,000, six months later another buyer paid the same as Prevost for a similar unit and traded Crock carpet in lieu of the $5,000 down payment. The record also establishes that Prevost paid the escrow and title insurance fees, the cost of termite inspection, and other incidental closing costs, which he claimed were not negotiated in lieu of the down payment. In addition, he paid, albeit indirectly, the additional sum of approximately $1,200 by agreeing to reduce the rent charged to Crock's daughter. We therefore conclude there are triable issues of material fact as to the truth of the bank's proof of loss statement.

## II

### A.

Prevost's second cause of action for breach of the oral employment agreement alleges he was discharged without just cause and without the authority of First Western's board of directors after he had completed the 90-day probationary period. In its motion for summary judgment First Western argued the contract cause of action was barred by the statute of frauds. The bank acknowledges it incorrectly relied on two cases pending before the California Supreme Court, *Foley* v. *Interactive Data Corp.* (1985) 193 Cal.App.3d 28 [219 Cal.Rptr. 866], review granted January 30, 1986 (2-B009001), and *Santa Monica Hospital* v. *Superior Court* (1985) 192 Cal.App.3d 138 [218 Cal.Rptr. 543], review granted January 16, 1986 (2-B012103), in support of its position. The trial court found that First Western was entitled to judgment as a matter of law on the contract theory of recovery.

Given the present uncertainty with regard to the statute of frauds issue, we adopt the approach taken in *Gray* v. *Superior Court* (1986) 181

Cal.App.3d 813 [226 Cal.Rptr. 570]. Noting that the grant of review in *Santa Monica Hospital* cast doubt on the interpretation of the law found in *Newfield* v. *Insurance Co. of the West* (1984) 156 Cal.App.3d 440 [203 Cal.Rptr. 9], this court concluded in *Gray* that it was fairer not to sustain a demurrer to the contract cause of action on a statute of frauds basis. Here as in *Gray,* should the view expressed in *Newfield* become the law, it will be easier to strike from any judgment Prevost may recover the amount based on the oral contract than to require retrial of the contract claim should the statute of frauds be found not to apply.

### B.

The wording of the personnel policy manual implies First Western must have cause to terminate an employee during the 90-day probationary period.[2] It also states that any dismissal will be discussed with the bank president. ▮▮▮ Having disposed of the legal question regarding the statute of frauds, the question remains whether there is a triable issue of material fact as to First Western's just cause to dismiss Prevost and the bank's compliance with the procedures outlined in the personnel policy manual.

At summary judgment First Western's breach of contract argument emphasized the statute of frauds issue. The only evidence submitted in support of the argument Prevost was dismissed for good cause is contained in the declaration of James Hildreth. There is a serious question whether Hildreth was competent to testify regarding Prevost's employment because he did not become bank president until July 1984 and was not a percipient witness. Hildreth states that "[t]he BANK *apparently* based its decision to terminate PREVOST on the grounds that PREVOST had failed to follow standard operating procedures regarding loans, PREVOST'S lack of regard for customer privacy, and because the BANK had received a number of customer complaints regarding PREVOST," citing a letter from Prevost's personnel file dated April 17, 1984, over a month after his dismissal. (Italics supplied.) At most the Hildreth declaration may be viewed as providing a foundation for introduction of the letter.

Prevost stated that his work had never been criticized and no one had informed him that dismissal was contemplated. Toorop, the vice president who fired Prevost, had told him just two days earlier that Prevost was "his boy" and could look forward to a long and successful career at the bank. Robert McNeil, president of the bank during Prevost's tenure, stated he had

---

[2] See pages 1495-1496 *ante.* Prevost alleged at paragraph 14 of his complaint and argued at summary judgment that he was terminated after his probationary period had expired. First Western argued that its only obligation at the close of the 90-day period was to review Prevost's employment status and decide if it wished to convert him to the status of full-time employee.

reviewed his job performance on numerous occasions and felt Prevost was doing a fine job. He never heard anyone on the loan committee voice complaints about the accuracy or thoroughness of Prevost's loan packages. McNeil specifically refuted the grounds for dismissal contained in the April 17, 1984, letter. This and other evidence suggests that this case may present the classic wrongful termination scenario—that Prevost was not dismissed because of dissatisfaction with his job performance but as a result of the power struggle between Toorop and McNeil. We conclude there is a triable issue of material fact regarding the basis for Prevost's dismissal.

## III

In the third cause of action Prevost asserts the bank breached the implied covenant of good faith and fair dealing by failing to give notice of its intention to discharge him or grounds for the discharge as required by the personnel policy manual. He further alleges that First Western dismissed him without cause.

First Western argues it was not required to give Prevost notice of its intent to fire him. It says the personnel policy manual did not require First Western to provide Prevost with the reasons for termination at the time of termination. The bank also claims Prevost lacked the longevity of service necessary to state a cause of action for breach of implied covenant, citing *Cleary* v. *American Airlines, Inc.* (1980) 111 Cal.App.3d 443 [168 Cal.Rptr. 722].

■ Although longevity of satisfactory service is helpful to a plaintiff in establishing breach of duty of fairness toward him, that factor is not essential to the cause of action. (*Gray* v. *Superior Court, supra,* 181 Cal.App.3d at p. 821.) ". . . [A] breach of the implied covenant of good faith and fair dealing in employment contracts is established whenever the employer engages in 'bad faith action extraneous to the contract, combined with the obligor's intent to frustrate the [employee's] enjoyment of contract rights.'" (*Ibid.,* citing *Shapiro* v. *Wells Fargo Realty Advisors* (1984) 152 Cal.App.3d 467, 479 [199 Cal.Rptr. 613].) Thus an action will lie where the existence of good cause for discharge is asserted by the employer without a good faith belief that good cause in fact exists. *(Koehrer* v. *Superior Court* (1986) 181 Cal.App.3d 1155, 1171 [226 Cal.Rptr. 820], citing *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 769-770 [206 Cal.Rptr. 354, 686 P.2d 1158].) "The true reasons for an employee's dismissal, and whether they show bad faith rather than dissatisfaction with services and reflect intention to deprive the discharged employee of the benefits of the contract, are evidentiary questions most properly resolved by

the trier of fact." *(Khanna* v. *Microdata Corp.* (1985) 170 Cal.App.3d 250, 263 [215 Cal.Rptr. 860].) ▮ Based on the evidence previously described, we conclude there is a triable issue of material fact regarding the true basis for Prevost's dismissal and whether First Western acted in bad faith.

## IV

Prevost's last two causes of action seek damages for intentional and negligent infliction of emotional distress. ▮ The elements of a prima facie case for intentional infliction of emotional distress include: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *(Cervantez* v. *J. C. Penney Co.* (1979) 24 Cal.3d 579, 593 [156 Cal.Rptr. 198, 595 P.2d 975].) Conduct may be considered outrageous when a defendant abuses a position that gives it the power to damage plaintiff's interest. *(Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 946 [160 Cal.Rptr. 141, 603 P.2d 58].) " 'Whether treated as an element of the prima facie case or as a matter of defense, it must also appear that the defendants' conduct was unprivileged.' " *(Cervantez* v. *J. C. Penney Co., supra,* 24 Cal.3d at p. 593; quoting *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 394 [89 Cal.Rptr. 78, 47 A.L.R.3d 286].)

▮ At summary judgment First Western argued the emotional distress claims failed because there were no triable issues in the first three causes of action. The bank also argued its filing of the proof of loss statement could not constitute outrageous conduct because the filing was required by OCC. On appeal the bank shifts the focus of its argument and asserts Prevost has submitted no evidence of emotional distress. It also argues the bank's filing of the proof of loss statement was privileged.

To be granted summary judgment, the moving party's supporting papers must be sufficient to sustain a judgment in his favor. When the defendant is the moving party, he must negate completely an essential element of plaintiff's case or establish a complete defense. *(Fireman's Fund Ins. Co.* v. *City of Turlock* (1985) 170 Cal.App.3d 988, 994.) We have already decided First Western's defense of absolute privilege fails and that there are triable issues as to the truth of the proof of loss statement and the basis for Prevost's dismissal. The bank offered no evidence to negate allegations of severe

emotional distress. For these reasons we conclude there is a triable issue as to whether the bank's actions amounted to outrageous conduct.

## DISPOSITION

Judgment reversed. First Western to bear all costs.

Kremer, P. J., and Butler, J., concurred.