Filed 9/29/14  Rossi v. Photoglou CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| GRETCHEN ROSSI, | |
| Plaintiff and Respondent, | G048206 |
| v. | (Super. Ct. No. 30-2010-00365771 consol. w/ No. 30-2010-00393514) |
| JAY PHOTOGLOU, | |
| Defendant and Appellant. | O P I N I O N |
| JAY PHOTOGLOU, | |
| Plaintiff and Appellant, | |
| v. | |
| GRETCHEN ROSSI, | |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Gregory Munoz and David R. Chaffee, Judges.  Affirmed in part and reversed in part.

Matthew E. Hess for Jay Photoglou.

Brown & Charbonneau, Gregory G. Brown and Alison S. Flowers for Gretchen Rossi.

\*                    \*                    \*

Gretchen Rossi, a cast member of the nationally televised reality show the "Real Housewives of Orange County" (sometimes, Real Housewives), maintained a friendship with Jay Photoglou during the time the show was televised. Each presented starkly different accounts of their relationship, however. She contends they were merely friends, who belonged to the same social group that enjoyed going to bars, restaurants, and parties, but she denied they were romantically involved. He contends they dated exclusively for more than a year while she was engaged to another man on the show who was dying of leukemia. According to Photoglou, he was Rossi's secret boyfriend and her engagement to the other man was staged for the television show. This case deals with the aftermath of their relationship.

Rossi sued Photoglou alleging he assaulted her on numerous occasions, stalked and threatened her with physical harm, and stole her personal property, including numerous nude and compromising photographs. Rossi also alleged Photoglou intentionally interfered with product endorsement and appearance contracts she had or was negotiating by releasing the stolen photographs of her to various Web sites and other media outlets, publicly claiming to be her boyfriend while she was engaged to another man on the show, having tabloid articles written about their relationship, and sending copies of the photographs and articles to the companies with which Rossi was dealing. Photoglou sued Rossi, claiming she retaliated against him for telling the truth about their relationship and defamed him in interviews and on Internet blogs by calling him a thief and a liar, and also falsely accused him of assaulting and threatening to kill her.

Following a consolidated trial on all claims, the jury returned a general verdict for Rossi and awarded her $500,000 in compensatory damages and $23,250 in

punitive damages.  Photoglou appeals and asserts a host of errors.  As explained below, he forfeited several of his challenges because he failed to preserve them at trial by either objecting to the admission of evidence or requesting a special verdict.  We also conclude his other contentions lack merit, with one exception.  The trial court erred by granting Rossi summary adjudication on Photoglou's libel, slander, and false light claims based on Rossi's statements during what the parties have called the show's reunion episode.  The court relied on a release Photoglou signed several months earlier, but public policy prohibits enforcement of the release because it exculpates Rossi for intentional wrongdoing.

Accordingly, we reverse and remand for further proceedings on Photoglou's libel, slander, and false light claims based on Rossi's statements during the reunion episode.  We affirm the judgment in all other respects, including the jury's verdict on Photoglou's claim Rossi libeled and slandered him after the reunion episode was filmed.

I

FACTS AND PROCEDURAL HISTORY

In December 2007, Rossi was a 30-year-old real estate agent who became engaged to her wealthy boyfriend, 53-year-old Jeff Beitzel.  That same month doctors diagnosed Beitzel with acute leukemia.  He spent the next 10 months in and out of the hospital until he died in September 2008.  Rossi regularly cared for and visited Beitzel in the hospital, and when he was not hospitalized the couple lived together.

In early 2008, while Beitzel was in the midst of his battle with leukemia, Rossi was approached about joining the reality television show "Real Housewives of Orange County" as one of the "housewives."  Rossi decided to join the show and began filming during the summer of 2008.  As a principal cast member, camera crews followed Rossi and recorded much of her daily life as she visited Beitzel in the hospital, spent time

3

with her family, and also attended parties and a variety of social events with her friends. The show invited viewers to decide whether Rossi was a saintly figure devoted to caring for her sick fiancé, or a party girl only interested in his money. Several of the episodes focused on Rossi and her relationship with Beitzel.

Photoglou, a car salesman, met Rossi through mutual friends. He claims he dated Rossi "exclusively" from January 2008 until they broke up in February 2009. According to Photoglou, Rossi's relationship with Beitzel was staged for the television show while he and Rossi maintained an exclusive relationship. Rossi, however, claims she never dated Photoglou and was never romantically involved with him. According to Rossi, she and Photoglou were merely friends who frequently attended events and parties with mutual friends. She admits Photoglou helped her with various "manager-type" activities during 2008 and early 2009, including coordinating some appearances relating to the television show, attempting to book other appearances for Rossi, and miscellaneous errands and other matters. Although Photoglou regularly socialized with Rossi and he met her family, he never appeared on the television show.

As with the nature of their relationship, Rossi and Photoglou provided vastly different stories about the events that led to this litigation. Between the spring of 2008 and January 2009, Rossi and Photoglou had several violent arguments, usually after a night of heavy drinking and partying. According to Rossi, Photoglou became very angry with her on these occasions, yelling and swearing at her and even threatening to kill her. She claims he threw her against a wall during one argument, pulled her hair and punched the windshield of her car during another, and on a third occasion broke into her house and called 911 claiming she had attempted to commit suicide. Photoglou acknowledges he had several arguments with Rossi, but denies he became physical with her. To the contrary, Photoglou claims that Rossi punched him on at least one occasion and that these events usually occurred when he was trying to calm an inebriated Rossi. Although she claims she was afraid of Photoglou when these incidents occurred, Rossi

testified she maintained her friendship with him because he was always contrite, and even apologized to her father and brother on one occasion. Rossi also testified she wanted to make sure Photoglou repaid $18,000 she loaned him.

Following one of these arguments in July 2008, Photoglou called another cast member from the television show, Tamra Barney, and revealed he was Rossi's secret boyfriend. He also contacted the Orange County Register, but the newspaper did not print the story. Shortly after making these calls, Photoglou apologized to Rossi, explaining he made the statements because he was drunk and frustrated. In doing so, he acknowledged the claim he was Rossi's boyfriend was false. Nonetheless, over the next several months he repeatedly threatened to tell the media he was Rossi's boyfriend.

In January 2009, the television show filmed a "reunion episode." During filming, Barney confronted Rossi about Photoglou's claim that he was Rossi's boyfriend while she was engaged to Beitzel. Rossi denied on camera she had a romantic relationship with Photoglou, claiming Photoglou lied because he was angry she had spurned his sexual advances. Rossi also acknowledged sending Barney an e-mail accusing Photoglou of being a stalker. Although the cast members made numerous on-camera references to Photoglou during filming, neither his last name nor his face appeared in the reunion episode when it aired in February 2009.

Before the reunion episode aired, Photoglou asked the show's producers not to mention his name in the program. He also asked Rossi to intervene and convince the producers to remove his name. When the producers and Rossi refused, Photoglou contacted various media outlets and Web sites to "get in front of the scandal" and rebut the statements about him before they aired on national television.

Photoglou first posted his claim that he was Rossi's boyfriend on an Internet blog dedicated to television shows about the real housewives. He e-mailed the National Enquirer tabloid newspaper, claiming he was Rossi's boyfriend and offered to tell the "real story." Photoglou forwarded this e-mail to Rossi asking, "Is this really the

5

way we are going to end this? Is there anything you think we should talk about before this interview so we don't look back and say I wish we would have done this different?" As part of his media strategy, Photoglou provided several Web sites and newspapers with pictures of him and Rossi kissing and embracing, but he claims he never sent any photographs that showed Rossi partially nude or in a compromising position.

After receiving Photoglou's e-mail to the National Enquirer, Rossi discovered the memory card from her camera and several private photographs she kept in her home were missing. Some of these pictures showed Rossi topless while driving in a car and sitting at home in her underwear. Shortly thereafter, the partially nude pictures of Rossi appeared on the Web site "thedirty.com" and were then reposted to numerous other Web sites. Additional graphic photographs of Rossi that she did not know existed also began to appear on some Web sites. In the weeks following his e-mail to the National Enquirer, Photoglou phoned Rossi and twice threatened to kill her and her dogs, and also threatened to burn her house down. During this period, Photoglou also regularly communicated with tabloid media sources in an ongoing effort to discredit Rossi's version of their relationship.

Rossi claims she lost several product endorsements and other appearances because of the negative publicity surrounding the Internet pictures and the stories about her having a boyfriend while engaged to Beitzel. According to Rossi, companies either cancelled their contracts with her or broke off negotiations after the Internet photographs and stories surfaced. These companies also received anonymous e-mails or packages providing copies of the pictures and stories. Photoglou contends Rossi retaliated against him for telling the truth about their relationship by making Internet blog posts, sending e-mails, and giving interviews in which she falsely accused Photoglou of a wide variety of wrongs, including lying, stealing, and assaulting and threatening to kill her.

In January 2010, Photoglou filed a lawsuit against Rossi alleging claims for libel, slander, and "invasion of privacy–false light" based on her statements in the

6

reunion show and media interviews, and also in various Internet blog posts and e-mails.[1]
Rossi responded three months later by filing a separate lawsuit against Photoglou alleging
claims for assault, battery, stalking, intentional infliction of emotional distress,
conversion, intentional interference with contractual relations, and intentional
interference with prospective economic relations based on the conduct described above.[2]
The trial court consolidated the two actions.

After Rossi's summary adjudication motion eliminated Photoglou's claims
based on Rossi's statements in the reunion episode, the parties' tried the other claims to a
jury during October and November 2012. The jury returned a general verdict in favor of
Rossi on all of her claims against Photoglou, except the battery claim, and also on all of
Photoglou's claims. The jury awarded Rossi $500,000 in compensatory damages and
$23,250 in punitive damages. Photoglou timely appealed from the judgment the trial
court entered on the jury's verdict.

Photoglou asserts a number of challenges to the trial court's rulings and the
jury's verdict. We provide additional facts below as necessary to address his contentions.

II

DISCUSSION

A.    *Photoglou Did Not Release His Claims Against Rossi*

An episode of Real Housewives was filmed during a trip Rossi, her family,
and some of her friends, including Photoglou, took to the vacation home of Rossi's
parents in Bass Lake, California. Because Photoglou was on the set during the filming,

---

[1]    Photoglou also alleged a conversion claim against Rossi, but he did not
present that claim to the jury. The parties do not explain how the claim was resolved.

[2]    Rossi also alleged claims for slander, libel, false light, and breach of
contract against Photoglou. The trial court dismissed the slander, libel, and false light
claims when it granted Photoglou's anti-SLAPP motion. Rossi did not pursue her breach
of contract claim at trial. The parties do not explain how that claim was resolved.

producers had him sign an "Appearance Release" (Release), which authorized the show to film Photoglou and use his likeness in the production and marketing of the show. The Release also exonerated the producers and their employees, officers, and agents "from any and all claims, demands, controversies, causes of action, damages, rights, liabilities and obligations whatsoever (including, without limitation, any defamation claim and/or claim that such use invades any right of privacy and/or publicity) ('Claims'), arising directly or indirectly out of or in connection with the Program and/or the use of my likeness."

Before trial, Rossi moved for summary adjudication on Photoglou's libel, slander, and false light claims, arguing the Release barred the claims. The trial court granted the motion on each cause of action "as to the alleged statements made on the Reunion Show only" because the court found the Release unambiguously applied to statements made during the show. The court, however, denied the motion on all other statements Rossi made about Photoglou "on the Bravo TV blog, on [Rossi's] personal blog, or in interviews with People Magazine and TV Guide Magazine" because a triable issue of fact existed on whether the parties intended the Release to apply to statements made outside of the show. The jury therefore heard Photoglou's claims based on the statements made outside the show. Rossi raised several defenses to these claims, including an argument the Release barred all claims. As explained above, the jury returned a general verdict for Rossi on Photoglou's claims.

Photoglou contends the trial court erred when it granted summary adjudication and allowed Rossi to rely on the Release at trial. He argues the Release violates public policy and Civil Code section 1668 (Section 1668) by exempting Rossi from liability for intentional wrongdoing.[3] We separately address the trial court's

---

[3] Although Rossi does not object, we note Photoglou did not argue Section 1668 invalidated the Release in the trial court. Nonetheless, whether a contractual provision violates Section 1668 is a question of law that we independently

8

decision to grant Rossi summary adjudication and to allow her to rely on the Release at trial.

1. The Trial Court Erred in Granting Rossi Summary Adjudication Based on the Release

Section 1668 prohibits certain contractual exculpatory clauses by stating, "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." Under this statute, "contractual releases of future liability for fraud and other intentional wrongs are invariably invalidated." (*Franham v. Superior Court* (1997) 60 Cal.App.4th 69, 71; see *Health Net*, *supra*, 113 Cal.App.4th at p. 234 ["It is now settled . . . 'a party [cannot] contract away liability for his fraudulent or intentional acts or for his negligent violations of statutory law'" (italics omitted)]; *Baker Pacific Corp. v. Suttles* (1990) 220 Cal.App.3d 1148, 1153-1154 [same].) California courts have applied Section 1668 to invalidate contracts that release future liability for a wide variety of wrongdoing, including trespass and assault arising from the repossession of a car (*Loughan v. Harger-Haldeman* (1960) 184 Cal.App.2d 495, 506), negligent misrepresentation by a stock brokerage firm (*Blankenheim v. E. F. Hutton & Co., Inc.* (1990) 217 Cal.App.3d 1463, 1471-1473), and breach of fiduciary duty by a homeowner's association (*Cohen v. Kite Hill Community Assn.* (1983) 142 Cal.App.3d 642, 654-655).

In *McQuirk v. Donnelley* (9th Cir. 1999) 189 F.3d 793 (*McQuirk*), the court applied Section 1668 to invalidate a release the defendant raised as a bar to claims for defamation, interference with business expectancy, and intentional infliction of emotional

review (*Health Net of California, Inc. v. Department of Health Services* (2003) 113 Cal.App.4th 224, 232 (*Health Net*)), and therefore it may be raised for the first time on appeal when the facts are undisputed (*In re Marriage of Priem* (2013) 214 Cal.App.4th 505, 510-511). There is no factual dispute concerning the Release.

distress. (*McQuirk*, at pp. 796-797.) The plaintiff in *McQuirk* completed a job application that authorized the potential employer to contact the plaintiff's previous employers and also released the previous employers "from any liability resulting from the provision of . . . information [about the plaintiff]." (*Id*. at p. 795.) He sued one of his previous employers when it provided information that led the potential employer to rescind the plaintiff's employment offer. The trial court relied on the release in the job application to grant the previous employer summary judgment. (*Ibid*.) The appellate court reversed, finding the release unenforceable because it "violates [section] 1668 . . . by shielding [the previous employer] from liability for intentional torts." (*McQuirk*, at p. 796.)

Here, Photoglou's claims for libel, slander, and false light are intentional torts based on conduct that occurred several months after Photoglou signed the Release. (*McQuirk*, *supra*, 189 F.3d at pp. 796-797 [Defamation is an intentional tort claim subject to Section 1668's prohibition on exculpatory clauses]; see *Stellar v. State Farm General Ins. Co.* (2007) 157 Cal.App.4th 1498, 1505 ["'Defamation, which includes libel and slander, is [an] intentional tort which requires proof that the defendant intended to publish the defamatory statement'"]; *Eisenberg v. Alameda Newspapers, Inc.* (1999) 74 Cal.App.4th 1359, 1385, fn. 13 ["When a false light claim is coupled with a defamation claim, the false light claim is essentially superfluous, and stands or falls on whether it meets the same requirements as the defamation cause of action"].) Accordingly, we conclude the trial court erred in granting Rossi summary adjudication based on the Release because Section 1668 renders the Release unenforceable as a contract exempting her from liability for her intentional torts.

Rossi contends the Release is enforceable because Section 1668 does not apply here. She argues Section 1668 only applies if the contract containing the release affects the public interest or relates to a service of great public importance, and a release to appear on a reality television show satisfies neither of those requirements. Rossi cites

*Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92, to support this contention, but *Tunkl* only addressed the validity of contractual clauses seeking to avoid responsibility for ordinary negligence. (*Id.* at pp. 94, 101.) "*Tunkl* did not, however, add a 'public interest' requirement where the contract purports to avoid liability for fraud, willful injury, or violation of law, whether intentional or negligent. The plain language of section 1668 renders such exculpatory provisions invalid as against public policy, and nothing in *Tunkl* alters that." (*Capri v. L.A. Fitness International, LLC* (2006) 136 Cal.App.4th 1078, 1084.) Here, we address intentional tort claims only, and therefore *Tunkl*'s public interest requirement does not apply.

Rossi also contends "the entire entertainment industry would grind to a halt" if Section 1668 invalidated the Release. We are not persuaded by Rossi's dire predictions. The Release is necessary for the show's producers to film a person and use that person's likeness in producing and promoting the show, and our decision does not affect that aspect of the Release. Rossi, however, does not explain why the producers require a release that would allow people appearing on the show to defame one another with impunity, and she provides no explanation why reality television shows should be exempt from Section 1668's well-established public policy against exculpatory clauses for intentional wrongdoing. To the extent the producers of reality television shows believe they need an exemption from Section 1668, they should direct their arguments to the Legislature, not the courts.

2. The Release's Unenforceability Does Not Invalidate the Jury's General Verdict on Photoglou's Claims

Our conclusion Section 1668 renders the Release unenforceable does not require us to reverse the jury's general verdict for Rossi on Photoglou's libel and slander claims because alternative grounds support the verdict.[4] Indeed, "[i]t is well settled that

_____

[4] Photoglou also went to trial on his false light claim, but the trial court did not instruct the jury on that claim and struck it from the general verdict form because it

11

'[w]here several counts or issues are tried, a general verdict will not be disturbed by an appellate court if a single one of such counts or issues is supported by substantial evidence and is unaffected by error, although another is also submitted to the jury without any evidence to support it and with instructions inviting a verdict upon it.'  [Citations.]" (*Bresnahan v. Chrysler Corp.* (1998) 65 Cal.App.4th 1149, 1153 (*Bresnahan*); *Liberty Transport, Inc. v. Harry W. Gorst Co.* (1991) 229 Cal.App.3d 417, 427 (*Liberty Transport*), disapproved on other grounds in *Adams v. Murakami* (1991) 54 Cal.3d 105, 116; *McCloud v. Roy Riegels Chemicals* (1971) 20 Cal.App.3d 928, 935-936 (*McCloud*); 7 Witkin, Cal. Procedure (5th ed. 2008) Trial, § 354, pp. 413-414.)

This rule requires us to assume the jury reached its general verdict by relying on any defense supported by substantial evidence and free from error.  (*Liberty Transport*, *supra*, 229 Cal.App.3d at p. 427; *McCloud*, *supra*, 20 Cal.App.3d at pp. 935-936.)  An appellate court may not guess which of several possible grounds the jury relied upon to reach its decision when at least one valid ground supports the verdict and the appellant could have avoided this presumption by requesting a special verdict. (*McCloud*, at pp. 936-937.)

For example, the plaintiff in *McCloud* sued the defendant for negligently causing an automobile accident.  (*McCloud*, *supra*, 20 Cal.App.3d at pp. 930-931.)  The defendant denied it was negligent, and, alternatively, argued the plaintiff's claim failed based on imputed contributory negligence.  (*Id*. at p. 935.)  The jury returned a general verdict for the defendant and the plaintiff appealed, arguing the trial court erroneously instructed the jury on contributory negligence.  The Court of Appeal affirmed the jury's verdict, explaining it was irrelevant whether the trial court erroneously instructed the jury on imputed contributory negligence because substantial evidence supported the

found the libel and slander claims covered the same ground.  Photoglou does not challenge that ruling.

12

defendant's theory it was not negligent, and therefore the appellate court was required to presume the jury relied on that theory in reaching its verdict. (*Id.* at pp. 935-936.)

At trial, Rossi argued at least four separate defenses to Photoglou's libel and slander claims: (1) all of her statements were true; (2) her statements were nonactionable opinions; (3) some of the statements were privileged communications to law enforcement; and (4) the Release barred Photoglou's claims. Because the jury returned a general verdict, we do not know which defense the jury relied on in reaching its verdict. Section 1668 only defeats the last of these four defenses and Photoglou offers no explanation why the other three defenses do not support the jury's verdict.

Substantial evidence supports Rossi's defense that her statements about Photoglou were true. Indeed, she testified Photoglou lied to her and stole her property, that he assaulted, battered, threatened, and stalked her, and that she was not romantically involved with him. Admittedly, Photoglou testified that Rossi's statements were false, but that conflict in the evidence does not change the fact Rossi's testimony constituted substantial evidence supporting the defense her statements were true. (*City and County of San Francisco v. Givens* (2000) 85 Cal.App.4th 51, 56 [single witness's testimony may constitute substantial evidence even when witness is party to action]; *Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053 [conflict in evidence does not change its substantiality and all conflicts must be resolved in favor of trial court decision], abrogated on other grounds as stated in *DeBerard Properties, Ltd. v. Lim* (1999) 20 Cal.4th 659, 668.)

Accordingly, although we reverse and remand for further proceedings on Photoglou's libel, slander, and false light claims based on the statements Rossi made during the reunion episode, we affirm the jury's general verdict on Photoglou's libel and slander claims based on the statements Rossi made after the reunion episode because Photoglou failed to show all of the defenses Rossi presented to the jury were unsupported by substantial evidence.

13

B.    *The Trial Court Did Not Abuse Its Discretion in Denying Photoglou's Request to Continue the Trial*

On the Monday trial was scheduled to start, Photoglou arrived with an attorney he had hired a few days earlier. On appeal Photoglou claims his new attorney asked for a one-week trial continuance because the attorney knew nothing about the case and needed time to prepare, but the court denied that request and refused to provide more than a one-day continuance. Photoglou contends the court deprived him of the effective assistance of counsel at trial. Photoglou, however, misrepresents both his attorney's request and the trial court's final ruling, which granted his attorney the continuance he sought.[5]

After Photoglou's attorney explained he was specially appearing because he had not yet agreed to substitute as counsel of record and represent Photoglou at trial, the attorney asked for a continuance as follows: "What I would ask the court, if it's going to go forward, if I'm going to be involved, that *we can do the procedural stuff between now and next Monday*, but actually to pick a jury to start this thing I would have to ask that we delay until the first of next week." (Italics added.) Rossi's attorney objected to the request, claiming any continuance would prejudice his client because trial had been continued six times, Photoglou was on his seventh attorney, and the court had warned Photoglou there would be no more continuances. Photoglou's attorney responded, "I need a couple days to figure out what I'm going to do, if, in fact, I'm going to do this. If we have a short continuance to next Monday, I don't think it is going to be burdensome on counsel. I understand, appreciate counsel's position, but I don't think it's going to be burdensome to counsel."

After hearing from both sides, the trial court responded by stating it typically does not continue trial based on a party hiring new counsel, but it was willing to

---

[5]    We note Photoglou's attorney on appeal is not the same attorney who represented him at trial.

14

"give you one day. We would resume on Wednesday with limine motions, and then I would expect to be jury selection following. We'd be trying this case on Thursday or completing jury selection and commence opening statement on Thursday . . . ." Photoglou's counsel informed the court he was unavailable on Thursday because of a previously scheduled hearing in San Diego on another case, and he asked for a few minutes to discuss the matter with his client.

When Photoglou and his attorney returned after the brief recess, the trial court explained it had reconsidered its position: "Before you say a word . . . I've been considering. I'm still unwilling to give you till Monday, on one hand. On the other, we can get this case kicked off on Wednesday, let you do your thing on Thursday. I have law and motion and other things on Friday, and then really get going on Monday." Photoglou's attorney accepted the trial court's proposal without objection: "That sounds like a plan. I was going to say that was my one hang-up I couldn't get around. If I have Thursday off, we can go ahead and do this."

The court therefore gave the parties the following day (Tuesday) off. They returned to court on Wednesday to argue in limine motions and work on the exhibit list, witness list, joint statement of the case, verdict form, and jury instructions. The attorneys returned to court on Friday to continue working on the exhibit list and other documents. The parties started jury selection the following Monday and proceeded with the trial. Accordingly, Photoglou received precisely the continuance his attorney requested when he stated: "[W]e can do the procedural stuff between now and next Monday, but actually to pick a jury to start this thing I would have to ask that we delay until the first of next week."

To the extent Photoglou suggests the judgment should be reversed because he received ineffective representation from his attorney, we express no opinion on the effectiveness of Photoglou's trial counsel and merely note a party to a civil action is not entitled to a retrial based on ineffective assistance from counsel. (*Chevalier v. Dubin*

15

(1980) 104 Cal.App.3d 975, 979-980; see *In re Marriage of Campi* (2013) 212 Cal.App.4th 1565, 1574-1575 [finding ineffective assistance of counsel arguments moot because there is no right to counsel in dissolution proceedings]; *In re Grunau* (2008) 169 Cal.App.4th 997, 1003 ["In a civil case, attorney negligence may be remediable by a malpractice action, and it may be better to relegate the aggrieved litigant to that remedy than to impair the finality of appellate judgments on the ground of counsel's deficient performance"].)

Because Photoglou's attorney received the additional time he requested, we need not address the parties' various contentions regarding whether good cause existed for a continuance, whether Photoglou's attorney had sufficient time to prepare for trial, and whether Photoglou lost his case because his attorney was unprepared.[6]

C.      *Photoglou Forfeited His Objection to the Admission of Civil Harassment Restraining Orders*

At trial, Rossi offered evidence three separate women obtained civil harassment restraining orders against him 11, 20, and 22 years ago.  Photoglou contends the trial court erred by admitting this evidence because the orders constituted inadmissible character evidence under Evidence Code section 1101.  Photoglou, however, forfeited this objection because he never raised the issue of character evidence in the trial court.

Evidence Code section 353 states, "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the

_____

[6]      Rossi requests that we judicially notice a bankruptcy petition Photoglou filed several months before trial and her motion for relief from the automatic bankruptcy stay.  We deny the request because the documents are irrelevant to the issues on this appeal.  (*Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 ["Although a court may judicially notice a variety of matters [citation], only relevant material may be noticed" (original italics)], overruled on other grounds in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276.)

16

erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the *specific ground* of the objection or motion . . . ." (Italics added.) Under this statute, our Supreme Court has repeatedly held a party's """"failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable."' [Citation.]" (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20 (*Demetrulias*); *People v. Partida* (2005) 37 Cal.4th 428, 433-434 (*Partida*).)

It is not enough to state any objection to the challenged evidence. "Rather, 'the objection must be made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the [party offering the evidence] an opportunity to establish its admissibility.' [Citation.] What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling. If the court overrules the objection, the objecting party may argue on appeal that the evidence should have been excluded for the reason asserted at trial, but *it may not argue on appeal that the court should have excluded the evidence for a reason different from the one stated at trial*. A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*Partida*, *supra*, 37 Cal.4th at p. 435, italics added.)

For example, in *Demetrulias*, the Supreme Court concluded the defendant forfeited his objection to character evidence because the defendant failed to object on that ground in the trial court; objections the evidence was nonresponsive, irrelevant, speculative, and lacked foundation did not alert the trial court the defendant was raising an objection based on inadmissible character evidence. (*Demetrulias*, *supra*, 39 Cal.4th at p. 21; see *People v. Williams* (2013) 56 Cal.4th 165, 189, 193 [objection prosecutor's questions concerning witness's plea agreement were leading and argumentative did not

17

preserve objection questions amounted to vouching for witness's credibility]; *Partida*, *supra*, 37 Cal.4th at pp. 433-435 [Evidence Code section 352 objection gang evidence was more prejudicial than probative did not preserve due process objection].)

At trial, Photoglou objected to the prior restraining orders on the grounds of relevancy, lack of foundation, hearsay, speculation, assumes facts not in evidence, and Evidence Code section 352, but not on the ground the orders were inadmissible character evidence under Evidence Code section 1101. Indeed, Photoglou concedes his attorney "did not object to the prior restraining orders on the grounds of Evidence Code § 1101 . . . ." Accordingly, Photoglou forfeited his argument the prior restraining orders were inadmissible character evidence (*Demetrulias*, *supra*, 39 Cal.4th at pp. 19-21), and he does not argue the trial court made an erroneous ruling on any of the objections he lodged at trial.

D.   *Substantial Evidence Supports the Trial Court's Finding Photoglou Was a Limited Public Figure*

A public figure in a defamation action must establish by clear and convincing evidence the defendant acted with actual malice, i.e., the defendant made the defamatory statements knowing they were false or with serious doubts about the truth of the statements. (*Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 84; compare CACI Nos. 1700, 1704.) The trial court found Photoglou was a limited public figure based on his "participation in the ongoing dialogue" about Rossi and her relationships, and therefore the court instructed the jury Photoglou had to establish actual malice to prevail on his libel and slander claims. Photoglou contends the trial court erred because he is a private figure, and therefore the requirement to establish actual malice did not apply. We disagree because substantial evidence supports the trial court's ruling.

There are two categories of public figures who are subject to the actual malice requirement. "The all-purpose public figure is one who has achieved such pervasive fame or notoriety that he or she becomes a public figure for all purposes and

18

contexts. The limited purpose public figure is an individual who voluntarily injects him or herself or is drawn into a specific public controversy, thereby becoming a public figure on a limited range of issues." (*Ampex Corp. v. Cargle* (2005) 128 Cal.App.4th 1569, 1577.)

"[A limited] 'public figure' plaintiff must have undertaken some *voluntary* act through which he seeks to influence the resolution of the public issues involved. . . . [¶] . . . [W]hen called upon to make a determination of public figure status, courts should look for evidence of affirmative actions by which purported 'public figures' have thrust themselves into the forefront of particular public controversies. . . . [S]uch a determination is often a close question which can only be resolved by considering the totality of the circumstances which comprise each individual controversy." (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 254-255, original italics (*Reader's Digest*); see *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 352 (*Gertz*) ["It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation"].) "It is not necessary to show that a plaintiff actually achieves prominence in the public debate; it is sufficient that '[a plaintiff] attempts to thrust himself into the public eye' [citation] or to influence a public decision. [Citation.]" (*Copp v. Paxton* (1996) 45 Cal.App.4th 829, 845-846.)

"At trial, whether a plaintiff in a defamation action is a public figure is a question of law for the trial court. [Citations.] On appeal, the trial court's resolution of disputed factual questions bearing on the public figure determination is reviewed for substantial evidence, while the trial court's resolution of the ultimate question of public figure status is subject to independent review for legal error. [Citations.]" (*Khawar v. Globe Internat., Inc.* (1998) 19 Cal.4th 254, 264; see *Denney v. Lawrence* (1994) 22 Cal.App.4th 927, 933 (*Denney*).)

The *Denney* decision provides a useful example of how these standards are applied. There, the plaintiff brought a defamation action based on a letter to the editor the defendant wrote regarding the public controversy surrounding the arrest, conviction, and sentencing of the plaintiff's brother for killing his own wife. (*Denney*, *supra*, 22 Cal.App.4th at pp. 930-932.) Before the letter was written, the plaintiff had given press interviews in which he sought to promote a version of the case favorable to his brother by providing private information about the relationship between his brother and sister-in-law, sharing nonpublic information about some of the physical evidence in the case, and expressing his purported expert opinion as a private investigator and former deputy sheriff on what the evidence showed. Based on the interviews, the trial court found the plaintiff was a limited public figure because he voluntarily thrust himself into the public debate about his brother's case and attempted to influence public opinion through the information he shared and the way he shared it. The Court of Appeal affirmed because substantial evidence supported the trial court's finding. (*Id.* at pp. 935-936.)

The *Denney* court contrasted the facts before it with an earlier case in which the plaintiff was found to be a private figure because he had described only what he had witnessed in a highly publicized murder without advocating any opinion. Moreover, the plaintiff in the earlier action provided his description of the events only when police and the courts required him to do so; he did not voluntarily provide press interviews seeking to influence public perception. (*Denney*, *supra*, 22 Cal.App.4th at pp. 934-935, discussing *Dresbach v. Doubleday & Co., Inc.* (D.D.C. 1981) 518 F.Supp. 1285; compare *Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 25 [doctor was limited public figure concerning debate on relative merits of plastic surgery because he "ha[d] thrust himself into that debate by appearing on local television shows as well as writing numerous articles in medical journals and beauty magazines, touting the virtues of cosmetic and reconstructive surgery"]; *Rudnick v. McMillan* (1994) 25 Cal.App.4th 1183, 1190-1191

20

(*Rudnick*) [plaintiff "made himself into a limited purpose public figure" by expressing concern over public land preserve on which he grazed cattle and inviting reporters to visit land preserve in expectation they would write articles about him and preserve's condition].)

Here, Rossi contacted Photoglou immediately after the reunion episode was filmed and informed him some of the other cast members mentioned his name during filming. She explained Barney accused Rossi of dating Photoglou while she was engaged to Beitzel, which Rossi denied on camera, and Barney also referred to Rossi's e-mail describing Photoglou as a stalker. Upon learning of these references, Photoglou did not wait to see which, if any, made their way into the edited episode later aired on national television. Instead, Photoglou launched a preemptive media blitz to reveal what he considered to be the truth about his relationship with Rossi before the episode aired.

He first posted a comment on a Web site dedicated exclusively to the real housewives television shows in which he identified himself and explained he had been Rossi's boyfriend for more than a year, including the period when she was engaged to Beitzel. In his post, Photoglou stated he wanted to "tell the Real Story" and that he "will answer anyone's questions." Next, Photoglou e-mailed the National Enquirer tabloid newspaper, again explaining he had been Rossi's boyfriend for more than a year and wanted to "tell the Real Story." The National Enquirer interviewed Photoglou and wrote a story about his relationship with Rossi. To further make his point, Photoglou provided the National Enquirer and various Web sites with photographs of him and Rossi embracing and kissing, and these outlets posted the photographs on the Internet.

Photoglou also obtained a recording of his 911 call when he claimed Rossi had attempted to commit suicide. He then made several Internet posts promising to post the recording because he thought it showed the true nature of his relationship with Rossi. For several weeks after the filming of the reunion episode, Photoglou continued to provide various Web sites and blogs with information about Rossi and his relationship

21

with her, and continued to do so after the reunion episode aired, although the show did not disclose Photoglou's last name or his face. Based on Photoglou's efforts, many Web sites and blogs posted articles and discussions about his relationship with Rossi.

The foregoing constitutes substantial evidence supporting the trial court's finding Photoglou was a limited public figure because it shows he thrust himself into the public debate about Rossi and her relationships, and attempted to influence public perception of his relationship with Rossi. Indeed, Photoglou is the one who disclosed his identity to the media and solicited them to write articles and post information about him and Rossi. Before implementing his media strategy, neither his identity nor his purported relationship with Rossi had been disclosed in the media, and even after he identified himself as Rossi's boyfriend neither his face nor his last name appeared on the television show. Accordingly, the evidence shows Photoglou voluntarily took affirmative action to thrust himself to the forefront of a particular public controversy and thereby became a limited public figure. (*Reader's Digest*, *supra*, 37 Cal.3d at pp. 254-255; *Denney*, *supra*, 22 Cal.App.4th at pp. 934-935; *Rudnick*, *supra*, 25 Cal.App.4th at pp. 1190-1191.)

Photoglou contends his many contacts with the media and Web sites concerning his relationship with Rossi did not make him a limited public figure because he merely was exercising his "privilege of rebuttal." According to Photoglou, all private persons are entitled to engage in "'self-help'" and respond to defamatory statements by contacting the media and making statements to contradict or correct the defamatory statements. Making such statements, Photoglou contends, does not transform a private figure into a limited public figure. Photoglou, however, misconstrues the law on limited public figures.

None of the cases he relies on recognizes or establishes a rebuttal privilege that authorizes private persons to respond to defamatory statements in any way they see fit without risk of becoming limited public figures. (See *Gertz*, *supra*, 418 U.S. at p. 344; *Wells v. Liddy* (4th Cir. 1999) 186 F.3d 505, 537 (*Wells*); *Clyburn v. News World*

22

*Communications, Inc.* (D.C. Cir. 1990) 903 F.2d 29, 32-33 (*Clyburn*).) To the contrary, although private persons may respond to defamatory statements in the press without automatically becoming limited public figures, the courts must examine each response and the surrounding circumstances to determine whether the person went beyond a simple response and whether the response thrust that person to the forefront of a public issue or sought to influence public opinion.

For example, the appellate court in *Wells* explained, "when an individual has had contact with the press, the proper questions are whether he has attempted to influence the merits of a controversy [citation], or has 'draw[n] attention to himself in order to invite public comment' [citation], or 'invited that degree of public attention and comment . . . essential to meet the public figure level' [citation]." (*Wells*, *supra*, 186 F.3d at p. 537 [private person did not become limited public figure by speaking to the press because she "simply [gave] an eye-witness account of events that are no longer controversial"].) Similarly, in *Clyburn*, the court explained, "the cases have suggested that ordinarily something more than a plaintiff's short simple statement of his view of the story is required; he renders himself a public figure only if he voluntarily 'draw[s] attention to himself' or uses his position in the controversy 'as a fulcrum to create public discussion.' [Citations.]" (*Clyburn*, *supra*, 903 F.2d at pp. 32-33 [plaintiff became limited public figure because his response through the media went "beyond an ordinary citizen's response" to alleged defamatory statements].)

Here, Photoglou thrust himself to the forefront of the public debate about Rossi and her relationships. Photoglou did not merely respond to media inquiries or provide a simple, factual statement about the nature of his relationship with Rossi. Instead, Photoglou took the offensive before any statement about him was made public. It was Photoglou who revealed his identity and thrust himself into the public light. As explained above, his last name and face were not revealed on the show. Nonetheless, he embarked on a media blitz that lasted for several weeks (if not months) during which he

23

contacted traditional media sources and numerous Internet sources in repeated attempts to influence public opinion and focus attention on himself.

Finally, assuming the trial court erred in finding Photoglou transformed himself into a limited public figure, we still would not reverse the judgment in Rossi's favor on Photoglou's libel and slander claims because the jury returned a general verdict in Rossi's favor and substantial evidence supports at least one of Rossi's defenses. (*Bresnahan*, *supra*, 65 Cal.App.4th at p. 1153 ["[i]t is well settled that '[w]here several counts or issues are tried, a general verdict will not be disturbed by an appellate court if a single one of such counts or issues is supported by substantial evidence and is unaffected by error'"].) As explained above, substantial evidence supports Rossi's defense that her statements were true.

E.    *The Trial Court Did Not Err in Denying Photoglou's Directed Verdict Motion*

Rossi's claims for intentional interference with contractual relations and prospective economic relations alleged Photoglou interfered with existing or future contracts for product endorsements and appearances by announcing to the media she was dating Photoglou while engaged to Beitzel, and sharing nude and compromising photographs and articles with the companies working or negotiating with Rossi. After Rossi presented her case, and before he offered any evidence, Photoglou moved for a directed verdict on these claims. The trial court denied the motion and the jury later returned a verdict for Rossi.

Photoglou contends the trial court erred in denying his directed verdict motion because Rossi failed to present sufficient evidence to support a verdict in her favor on the intentional interference claims. According to Photoglou, the gravamen of these claims was based on Rossi's claim he stole a memory card from her camera containing nude and compromising photographs of her, and then shared those photographs with companies that had contracted with Rossi or were negotiating contracts

24

with her. Photoglou contends the evidence failed to establish either of these essential elements. We disagree. The trial court correctly denied the directed verdict motion because Rossi presented substantial evidence to support the essential elements of her claims.

A directed verdict motion is essentially a demurrer to the evidence. In ruling on the motion, "the trial court has no power to weigh the evidence, and may not consider the credibility of witnesses. . . . A directed verdict may be granted only when, disregarding conflicting evidence, giving the evidence of the party against whom the motion is directed all the value to which it is legally entitled, and indulging every legitimate inference from such evidence in favor of that party, the court nonetheless determines there is no evidence of sufficient substantiality to support the claim or defense of the party opposing the motion, or a verdict in favor of that party. [Citations.]" (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 629-630 (*Howard*); see *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1119.)

An appellate challenge to a trial court decision *denying* a directed verdict motion is "therefore functionally equivalent to contending there was insufficient evidence to support the jury verdict against [the moving party]. Only if there is *no* substantial evidence in support of the verdict could it have been error for the trial court earlier to have denied [the directed verdict motion]." (*Howard*, *supra*, 72 Cal.App.4th at p. 630, original italics; *Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 263 ["Reversal of the denial of a motion for nonsuit or directed verdict is only proper when no substantial evidence exists tending to prove each element of the plaintiff's case"].)

Here, we need not address Photoglou's claim no evidence showed he stole the memory card from Rossi's camera because this was not relevant to her intentional interference claims. To survive Photoglou's directed verdict motion, Rossi had to introduce evidence Photoglou had control of the photographs and either shared them, or caused them to be shared, with companies that had contracted with Rossi or were

25

negotiating contracts with her. It is simply irrelevant how Photoglou obtained the photographs.

Photoglou contends "Rossi did not prove [he] sent the pictures to web sites or prospective employers." In support, he cites Rossi's testimony acknowledging she did not know who sent her photographs to the companies with which she was dealing, but she suspected Photoglou. According to Photoglou, this testimony is mere speculation, and therefore inadequate to establish he sent the photographs. Photoglou's argument does not establish the trial court erred in denying his directed verdict motion.

True, Rossi's testimony shows she did not know whether Photoglou sent the photographs to the companies. But Photoglou's argument fails to address whether Photoglou provided the photographs to the Web sites that posted them on the Internet. Rossi testified the companies pulled out of their contracts or negotiations with her because they received an anonymous package containing the photographs *and* saw the pictures on the Internet. Accordingly, Rossi only needed to show Photoglou sent the photographs to the companies *or* he had them posted on the Internet so the companies could see them. Photoglou does not address this second means of establishing the intentional interference claims, and therefore his challenge to the trial court's ruling on the directed verdict motion necessarily fails.

Photoglou's challenge also fails because Rossi introduced Photoglou's deposition testimony at trial admitting he provided her photographs to "thedirty.com," the "National Enquirer," "Seacoast," and the "Register" without Rossi's permission. The deposition testimony does not identify the specific photographs Photoglou provided to the Web sites and other media sources, but merely refers to exhibit numbers used during the deposition. Neither side pointed us to evidence explaining whether these photographs included the nude and compromising photographs. In designating the record on appeal, Photoglou did not include the deposition transcripts or exhibits that would have allowed us to resolve this issue.

26

We therefore must presume the photographs he admitted sharing with the Internet sites were the nude and compromising photographs that led the companies to pull out of their contracts or negotiations with Rossi because "the cardinal rule of appellate review [is] that a judgment or order of the trial court is presumed correct and prejudicial error must be affirmatively shown. [Citation.] 'In the absence of a contrary showing in the record, all presumptions in favor of the trial court's action will be made by the appellate court. . . .' [Citation.] . . . '"A necessary corollary to this rule is that if the record is inadequate for meaningful review, the appellant defaults and the decision of the trial court should be affirmed."' [Citation.]" (*Foust v. San Jose Construction Co., Inc.* (2011) 198 Cal.App.4th 181, 187; see *Oliveira v. Kiesler* (2012) 206 Cal.App.4th 1349, 1362.)

Photoglou argues his trial testimony acknowledged he provided photographs of Rossi in her clothes or a swimsuit to these Web sites or other media sources, but denied sharing any nude or compromising photographs of Rossi with anyone. Photoglou's testimony, however, was not presented until *after* he made and the trial court denied the directed verdict motion. Accordingly, the only testimony before the court when it ruled on the directed verdict motion was Photoglou's admission he provided photographs of Rossi to these Web sites and other media sources without explaining which photographs he provided. In any event, the trial court could not consider Photoglou's testimony because the court must disregard contrary evidence when ruling on a directed verdict motion. (*Howard*, *supra*, 72 Cal.App.4th at p. 629.)

F.    *Photoglou Forfeited His Challenge to the Jury's Damage Award Because He Failed to Request a Special Verdict on the Elements of Rossi's Damages*

The jury's general verdict awarded Rossi a lump sum of $500,000 in damages without specifying the amount awarded for past or future damages, economic or noneconomic damages, or each of the six causes of action on which Rossi prevailed. Photoglou challenges the sufficiency of the evidence to support the jury's award. He

27

argues Rossi failed to show the public disclosure of the photographs interfered with specific and existing contractual or economic relationships that caused her to lose $500,000 in future economic benefits. (See *Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212, 243.) Photoglou further contends Rossi's claims for assault, stalking, and intentional infliction of emotional distress cannot support the jury's award because Rossi did not suffer any physical injuries and provided no evidence showing she suffered an emotional injury requiring future medical treatment. Photoglou, however, forfeited these challenges by failing to request a special verdict on Rossi's damages and nonetheless failed to address all of Rossi's claims on which she prevailed.

"To preserve for appeal a challenge to separate components of a plaintiff's damage award, a defendant must request a special verdict form that segregates the elements of damages. [Citations.] The reason for this rule is simple. Without a special verdict separating the various damage components, 'we have no way of determining what portion—if any' of an award was attributable to a particular category of damages challenged on appeal. [Citation.]" (*Greer v. Buzgheia* (2006) 141 Cal.App.4th 1150, 1158 (*Greer*); *Heiner v. Kmart Corp.* (2000) 84 Cal.App.4th 335, 346 (*Heiner*); *English v. Lin* (1994) 26 Cal.App.4th 1358, 1369.)

For example, in *Heiner*, the plaintiff sought five elements of compensatory damages: "medical expenses, past loss of ability to work, present value of lost future 'earning capacity,' pain and suffering, and emotional distress resulting from financial injury." The jury returned a verdict awarding the plaintiff a lump sum of $3.8 million without differentiating between the various elements of damages. (*Heiner*, *supra*, 84 Cal.App.4th at p. 343.) On appeal, the defendant challenged the sufficiency of the evidence to support the jury's award of lost future earning capacity, but the appellate court concluded the defendant forfeited the issue by failing to request a special verdict on the plaintiff's damages. In the absence of a special verdict, the *Heiner* court explained, "we have no way of determining what portion – if any – of the $ 3.8 million was awarded

28

as compensation for [lost future earning capacity]." (*Id*. at p. 346; see *Greer*, *supra*, 141 Cal.App.4th at p. 1158 [defendant forfeited right to seek reduction in jury's award of past medical expenses because defendant failed to request special verdict specifying amount awarded on each element of past economic damages, and therefore court could not determine whether jury's award was for medical expenses or lost wages].)

Here, Photoglou separately challenges the amount of damages the jury awarded on the two intentional interference claims and the claims for assault, stalking, and intentional infliction of emotional distress, but he forfeited the issue by failing to request a special verdict on Rossi's damages. Indeed, without knowing how much the jury awarded on the intentional interference claims, we cannot determine whether the evidence supports the award.[7] Similarly, without knowing how much the jury awarded on the assault, stalking, and intentional infliction of emotional distress claims, we cannot determine whether the evidence supports the award.

Photoglou contends he did not forfeit the issue because requesting a special verdict on damages would have been futile. The record, however, does not support this contention. At the start of trial, Photoglou and Rossi submitted a proposed special verdict form following the Judicial Council of California Civil Jury Instructions model for each cause of action, comprising a total of 303 questions for the jury to answer. The trial court rejected that proposed form and instructed Photoglou and Rossi to prepare a new form that included no more than five questions per cause of action, or a total of 55 questions for the jury. The court explained, "if I don't like those questions in their formulation, we will still go with [the court's] version of the proper form for a trial of this nature, which is a general verdict form. [¶] . . . [¶] Which is . . . do you find for plaintiff, check the box,

---

[7]     We note the evidence supports at least some amount of damages on the intentional interference claims because the parties do not dispute that Rossi had a contract to appear at the Detroit Thanksgiving Parade for $10,000 and that appearance was cancelled once the organizers learned about the compromising photographs of Rossi.

or the defendant, check the box. . . . [Q]uestion 2, if you find for the plaintiff, what are the damages you award." Photoglou responded to the court's statement by stating, "I would vote for [the court's] verdict form." Photoglou and Rossi thereafter jointly agreed to a form that failed to breakdown the elements of Rossi's damages. The court submitted this form to the jury after Photoglou informed the court at least three times that he approved. At no time did the court tell Photoglou he could not have a special verdict on damages.[8]

Even if we consider Photoglou's challenge, he failed to show the jury award was error. In challenging the award, Photoglou did not address all of the causes of action on which the jury found for Rossi. He ignores the conversion cause of action, which alleged Photoglou converted a set of four car tires and rims, the camera memory card, and numerous personal photographs. Rossi testified the tires and rims had a value of $8,000, and Photoglou's own bankruptcy petition, which he signed under penalty of perjury, assigned an estimated value of $20,000 to $30,000 to "[d]igital form graphic photographs of Gretchen Rossi, Jay Photoglou, and Gretchen Rossi with Jay Photoglou." Accordingly, substantial evidence supports an award of $38,000 on the conversion claim.

Photoglou also fails to address the amount of past and future noneconomic damages the jury may have awarded Rossi. The court instructed the jury it may award Rossi damages for "[p]ast and future physical pain, mental suffering, loss of enjoyment

---

[8] Photoglou also contends, "[e]ven if any objection to the verdict form was waived, the award of damages can still be challenged" by citing and discussing the evidence. Not only does this contention make little sense because it essentially argues a forfeiture is not really a forfeiture, but the authority Photoglou cites does not support his argument. Photoglou relies on *Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, but that case addresses the fundamental appellate presumption the evidence supports the verdict and an appellant may overcome that presumption only by citing and discussing all evidence on the issue presented, not just the evidence favorable to the appellant. (*Id*. at p. 755.) *Fassberg* did not address a defendant forfeiting a challenge to the elements of a jury's damage award by failing to request a special verdict.

of life, inconvenience, grief, anxiety, humiliation, emotional distress, inability to sleep, and nightmares." It is well established there is "'no fixed or absolute standard'" for the jury to follow in computing damages for emotional distress (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1067-1068, fn. 17; *Hope v. California Youth Authority* (2005) 134 Cal.App.4th 577, 595), and therefore "'[t]he jury is entrusted with vast discretion in determining the amount of damages to be awarded . . .'" (*Hope*, at p. 595). No mandatory or maximum ratio exists linking a general damages award to special damages; general damages may be awarded in the absence of special damages. (*Westphal v. Wal-Mart Stores, Inc.* (1998) 68 Cal.App.4th 1071, 1078-1079 (*Westphal*).)

Here, Rossi testified about the humiliation and embarrassment she felt when she discovered nude and compromising pictures of her had been posted on numerous Web sites. She explained she received numerous prurient and harassing e-mails. Rossi feared for her life after Photoglou threatened to kill her. She suffered nightmares about Photoglou murdering her. Rossi testified she was afraid to go out in public because of the photographs, but was afraid to stay home because of Photoglou's threats. She also experienced significant pain in her neck requiring a trip to the emergency room and began losing chunks of her hair. Finally, she experienced great anxiety about her career because she continually had to deal with the consequences of Photoglou's actions.

Photoglou argues her emotional injuries abated over time and he questions their severity because Rossi did not present any evidence of medical bills or other economic damages she suffered. These arguments, however, do not address whether the jury erred by potentially awarding Rossi a significant amount of noneconomic damages. Photoglou does not dispute Rossi was entitled to recover noneconomic damages, nor does he cite any evidence or authority to show the jury erred if the entire $500,000 award was for noneconomic damages. "We must uphold an award of damages whenever possible [citation] and 'can interfere on the ground that the judgment is excessive only on the

31

ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury.' [Citations.]" (*Westphal*, *supra*, 68 Cal.App.4th at p. 1078.) Photoglou makes no such argument.

Without addressing each cause of action on which Rossi prevailed and the damages she sought, Photoglou cannot show the jury's lump sum award was erroneous even if we ignore his forfeiture of the issue when he failed to request a special verdict.[9]

### III

### DISPOSITION

The judgment is reversed and remanded as to the summary adjudication on Photoglou's claims for libel, slander, and false light based on the alleged statements made during the reunion episode. The judgment is affirmed in all other respects. Rossi shall recover her costs on appeal.


ARONSON, J.

WE CONCUR:


MOORE, ACTING P. J.


IKOLA, J.

---

[9] Photoglou also argues the jury's award was improper because it will financially ruin him. The financial impact of the jury's compensatory damages award, however, is irrelevant because the purpose of the award is to compensate Rossi for the damages she suffered as a result of Photoglou's conduct. The focus is on the damages Rossi suffered, not the award's impact on Photoglou or his ability to pay. Only a punitive damages award examines the impact on the defendant and his or her ability to pay it.